**ROBERT TROHA and FREDERICK**
**BIGNALL on behalf of themselves and all**
**others similarly situated,**

        **Plaintiffs,**

        **v.**

**UNITED STATES OF AMERICA,**

        **Defendant.**

)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No. 05-191-E**

## BRIEF OF *AMICUS CURIAE* -
## RAILS-TO-TRAILS CONSERVANCY IN SUPPORT OF DEFENDANT UNITED
## STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Neal R. Brendel
Pennsylvania Bar I.D. No. 31493
William D. Semins
Pennsylvania Bar I.D. No. 89550
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
(412) 355-6500
(412) 355-6501 fax

Of Counsel:

Andrea C. Ferster, General Counsel
RAILS-TO-TRAILS CONSERVANCY
1100 17th Street, N.W., 10th Floor
Washington, D.C. 20036
(202) 974-5142

Attorneys for *Amicus Curiae* Rails-to-Trails
Conservancy

January 19, 2007

## TABLE OF CONTENTS

I.     BACKGROUND ...................................................................................................1

   A.   Statutory and Regulatory History of the Federal Railbanking Law. ...................................1

   B.   The *Preseault* Decision and Applicable "Takings" Jurisprudence.....................................4

II.    ARGUMENT ......................................................................................................5

   A.   RAILBANKING AND INTERIM TRAIL USE ARE VALID RAILROAD
        PURPOSES EVEN UNDER DEEDS CONVEYING A RIGHT OF WAY
        EXPRESSLY LIMITED TO RAILROAD USES. ............................................................5

        1.   Railbanking Negotiations Demonstrate An Intent To Preserve Rather Than
             Abandon a Railway Corridor, Precluding Any Reversion Of The Underlying
             Property Rights To The Plaintiffs. ............................................................ 5

        2.   Railbanking And Interim Trail Use Is Within The Scope Of Railroad Right Of
             Way. ............................................................................................... 11

        3.   Railbanking And Interim Trail Use Fulfill Important State And Federal Public
             Policy Goals. ...................................................................................... 13

   B.   UNDER THE APPLICABLE TAKINGS JURISPRUDENCE, THE LIMITED
        IMPACT OF THE FEDERAL RAILBANKING LAW ON PROPERTY RIGHTS
        WOULD NOT EFFECT A "TAKING" OF ANY PROPERTY INTERESTS IN
        THIS CASE. ..........................................................................................15

        1.   Any "Takings" Claim That Accrued When the NITU Was Issued Is Merely A
             Temporary Takings Claim That Must Be Analyzed Under the Three-Part *Penn
             Central* Test. ..................................................................................... 16

        2.   Issuance of A NITU Alone Does Not Constitute A Compensable Temporary
             Taking. ............................................................................................. 18

        3.   Interim Trail Use Pursuant to the Railbanking Law Does Not Constitute A Taking.
             ..................................................................................................... 20

III.   CONCLUSION...................................................................................................23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Barclay v. U.S.A.*, 443  F.3d 1368 (Fed. Cir. 2006) ........................................................17

*Birt v. STB*, 90 F.3d 580 (D.C. Cir. 1996) ...............................................................2, 7

*Caldwell v. U.S.A.*, 391 F.3d 1226 (Fed. Cir. 2004), cert. denied, 126 S.Ct. 366
      (2005) ......................................................................................................17, 18

*California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir.),
      cert. denied, 506 U.S. 916 (1992) ..................................................................21

*Chevy Chase Land Co. v. United States*, 230 F.3d 1375 (Fed. Cir. 1999) ....................12

*Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29 (2000), aff'd 271 F.3d
      1327 (Fed. Cir. 2001), cert. denied, 535 U.S. 1096, 122 S.Ct. 2293 (2002) ............22

*Georgia Great S. Div., South Carolina Cent. R.R. Co., Inc. - Abandonment and
      Discontinuance Exemption - Between Albany and Dawson, In Terrell, Lee and
      Dougherty Counties, GA*, No. AB-289 (Sub-No. 1X), 2003 STB LEXIS 274, at
      *8 (S.T.B served May 1, 2003) ......................................................................9

*Glosemeyer v. USA*, 45 Fed. Cl. 771 (2000) ........................................................17, 22

*Grantwood Vill. v. Mo. Pac. R.R. Co.*, 95 F.3d 654 (8th Cir. 1996).............................9

*Hertz v. Woodman*, 218 U.S. 205 (1910)...............................................................22

*Ind. & Ohio Ry. Co. - Constr. & Operation - Butler, Warren and Hamilton
      Counties, OH*, 9 I.C.C. 2d 783 (1993) ...........................................................11

*Iowa Power - Const. Exempt. - Council Bluffs, IA,* 8 I.C.C.2 858 (1990)...............3, 10

*Louisiana & Ark. Ry. v. Bickham*, 602 F. Supp. 383 (M.D. La.), aff'd, 775 F.2d 300
      (5th Cir. 1989).……………………………………………………………………19

*Lucas v. S. C. Coastal Council*, 505 U.S. 1003 (1992)..........................................20, 21

*M&J Coal Co. v. United States*, 47 F.3d 1148 (Fed. Cir. 1994)...............................20, 21

*Mo. Pac. R.R. Co. -- Abandonment -- Exemption C in St. Louis County, MO*, No.
      AB-3 (Sub-No. 98X), 1997 STB LEXIS 2969 (S.T.B decided April 18, 1997) ............10

*Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825 (1986).………………………………...…16

*Norfolk & W. Ry. Co. - Abandonment Between St. Mary's and Minster in Auglaize County, OH,* 9 I.C.C.2d 1015 (1993) ..................................................................3, 10

*Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978)......................16, 18

*Preseault v. ICC,* 494 U.S. 1, 6 n.3 (1990) ...............................................2, 4, 5, 12, 19

*Preseault v. ICC,* 853 F.2d 145 (2d Cir. 1988) ...........................................................4, 21

*Preseault v. United States,* 100 F.3d 1525 (1996) (en banc) ......................4, 5, 17, 20, 22

*PruneYard Shopping Center v. Robbins,* 447 U.S. 74 (1980) .........................................18

*Reed v. Meserve,* 487 F.2d 646 (1st Cir. 1973)..........................................................3, 11

*Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984) .......................................................18

*Schmitt v. United States,* No. IP 99-1852-Y/S, 2003 WL 21057368 (S.D.Ind. Mar. 5, 2003)................................................................................................................22

*Scranton v. Wheeler,* 179 U.S. 141 (1900) ...............................................................20, 21

*Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency,* 535 U.S. 302 (2002)..............................................................................................................16, 18

*Texas v. Brown,* 460 U.S. 730, 737 (1983) ....................................................................22

*Toews v. U.S.A.,* 376 F.3d 1371 (Fed. Cir. 2004) ..........................................................22

*Union Pacific Railroad Company – Exemption  – Abandonment of Service in Morgan County, CO (Julesburg Subdivision),* 1997 WL 33786 (S.T.B. 1997) .........................7

*Union Pacific Railroad Company - Exemption - Abandonment of Service in McPherson County, KS,* 1997 STB LEXIS 2931, at *9 (S.T.B. 1997).................................................................7

## STATE CASES

*A. D. Graham & Co. v. Pennsylvania Turnpike Comm'n,* 347 Pa. 622, 33 A.2d 22 (1943).........................................................................................................................14

*Barney v. Burlington N. R.R.,* 490 N.W.2d 726 (S.D. 1992).........................................12

*Birdsboro Mun. Authority v. Reading Co.,* 758 A.2d 222 (Pa. Super. Ct. 2000) ............6

*Buffalo Township v. Jones,* 571 Pa. 637, 644, 813 A.2d  659 (2002)................................ passim

*Burnier v. Dep't of Envtl. Res.*, 148 Pa. Commw. 530, 611 A.2d 1366 (1992)....................6, 7, 8

*Chevy Chase Land Co. v. United States*, 733 A.2d 1055 (Md. 1999) ..................................11, 14

*Commonwealth of Pa. v. Kirkner*, 569 Pa. 499 805 A.2d 514 (2002) .........................................14

*Hatch v. Cincinnati & I.R.R. Co.*, 18 Ohio St. 92 (1868) ................................................................12

*Hatcher v. Chesner*, 422 Pa. 138, 221 A.2d 305 (1966)……………………………………………6

*Lacy v. Montgomery*, 181 Pa. Super. 640, 124 A.2d 492 (1956)................................................14

*Lawson v. Simonsen*, 490 Pa. 509, 417 A.2d 155 (1980) .............................................................6

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .....................................15

*Quarry Office Park Assoc. v. Phil. Elec. Co.*, 394 Pa. Super. 426, 576 A.2d 358
      (1990).........................................................................................................................6, 7, 8

*Reid v. Washington Gas Lt. Co.*, 194 A.2d 636 (Md. 1963)........................................................15

*Sabados v. Kiraly*, 258 Pa. Super. 532, 393 A.2d 486 (1978)........................................................6

*St. Louis-S.F. Ry. Co. v. Dillard*, 43 S.W.2d 1034 (Mo. 1931) ...................................................13

*St. Louis-S.F. Ry. Co. v. King*, 50 S.W.2d 94 (Mo. 1932) ............................................................13

*Thompson v. Md. & Penn. R.R. Pres. Soc'y*, 417 Pa. Super. 216, 612 A.2d 450
      (1992).............................................................................................................................6, 7

*Wash. Wildlife Pres., Inc. v. State*, 329 N.W.2d 543 (Minn. 1983)............................................12

## FEDERAL STATUTES

16 U.S.C. § 1241...........................................................................................................................1

16 U.S.C. § 1247......................................................................................................................1, 13

28 U.S.C. § 1346...........................................................................................................................4

49 U.S.C. § 10901........................................................................................................................10

49 U.S.C. § 10903....................................................................................................................1, 18

Pub. L. No. 104-88........................................................................................................................1

## STATE STATUTES

32 P.S. § 5611 ...............................................................................................................13

32 P.S. § 5613 ...............................................................................................................13

32 P.S. § 5614 ...............................................................................................................13

## FEDERAL REGULATIONS

49 C.F.R. § 1152.29 ...............................................................................................2, 9, 10

49 C.F.R. Part 1150 ........................................................................................................11

*Amicus Curiae* Rails-to-Trails-Conservancy (RTC)[1] submits this brief in support of

Defendant United States of America's Motion for Summary Judgment.

## I.     BACKGROUND

This brief relies on the Joint Statement of Facts (Document 26) filed by the parties on

December 8, 2006, incorporated by reference herein.  In addition, RTC offers the following

background on the federal railbanking program, which Plaintiffs allege has resulted in a "taking"

of their property.

### A.     Statutory and Regulatory History of the Federal Railbanking Law.

In 1983, Congress enacted Section 8(d) of the National Trails Systems Act, 16 U.S.C. §

1247(d) (hereinafter referred to as "the federal Railbanking Law") to preserve our nation's

rapidly disappearing rail corridor infrastructure for future rail service and energy-efficient

transportation uses by permitting inactive corridors to be used on an interim basis as trails.  The

federal Railbanking Law comes into play if a railroad wants to terminate its common carrier

obligation to provide freight rail service on a line, which action requires approval from the

Surface Transportation Board ("STB"), known prior to 1996 as the Interstate Commerce

Commission ("ICC").  49 U.S.C. § 10903.[2]  If a qualified entity wants to negotiate with the

railroad about saving that corridor for future rail and interim trail use, it may ask the STB to

issue a railbanking order (known as a Certificate of Interim Trail Use ("CITU") or, as in this

case, a Notice of Interim Trail Use ("NITU")) by filing a statement of willingness to assume

---

[1]    RTC is a national, non-profit organization dedicated to advocating and facilitating the preservation of presently inactive railroad corridors through the federal Railbanking Law, 16 U.S.C. § 1241 *et seq.*

[2]    Congress abolished the ICC effective January 1, 1996 in the Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) and replaced it with the STB.  The STB exercises all the powers and functions of the former ICC that are relevant to the issues in this case.

legal and financial responsibility over the corridor until such time as it is needed again for rail service. 49 C.F.R. § 1152.29(a).

Railbanking is voluntary on the part of the railroad. Importantly, the federal Railbanking Law does not require the railroad to transfer the right of way for that purpose, nor does it impose any new obligations or restrictions on the railroads. After 1983, just as before, it has remained entirely the railroad's choice and decision whether merely to discontinue rail operations "for an indefinite period while preserving the rail corridor for possible reactivation of service in the future," *Preseault v. ICC,* 494 U.S. 1, 6 n.3 (1990), or fully to abandon the right of way and thereby permit state law rights of reversion to take effect.

If the railroad agrees to enter into negotiations with a potential interim trail manager (and it need not do so), the STB issues a CITU or NITU, which delays for six months the entry of an abandonment order that might terminate STB authority over the line, thus giving the applicant and the railroad time to negotiate an interim trail use agreement. 49 C.F.R. § 1152.29(c), (d). The NITU may be extended to permit the railroad and the potential interim trail manager additional time to negotiate an agreement. *See Birt v. STB*, 90 F.3d 580, 590 (D.C. Cir. 1996). If an agreement is reached during the negotiating period established by the NITU or CITU, the corridor is railbanked and stays under federal authority for so long as the trail use continues and the corridor remains intact and potentially available for re-activated rail service. *Id.* at 583. If no agreement is reached within 180 days after the CITU or NITU is issued, the CITU or NITU provides that the railroad may fully abandon the line, and the railroad is free to dispose of the corridor, bringing the STB's regulatory jurisdiction over the corridor to an end. 49 C.F.R. § 1152.29(c)(1).

The federal Railbanking Law has been effectively serving its intended function of preserving inactive railroad corridors intact for future rail service. Although the national railbank has been in place for only twenty-two years, the law already has had a demonstrable

effect on the preservation of railroad corridors for active rail use.  By preserving these corridors

intact, the law has enabled a number of railroads to re-acquire corridors or re-activate rail service

after the rail corridors have been placed in the national railbank.[3]  Many more jurisdictions

throughout the country have acquired railbanked rail corridors for future use as light rail,

commuter rail, and transit lines, or have used such trails as part of a "rail *with* trails" project,

whereby trails are placed side-by-side with active rail lines, thereby preserving the corridor for

active passenger rail service, an alternative use as a transportation corridor for pedestrian and

non-motorized vehicles, and a corridor for any future freight rail service.

Congress was not alone, however, in its concern for the preservation of railway

corridors.  Indeed, to prevent the loss of these valuable national resources, both Congress and the

Pennsylvania Legislature passed "rails-to-trails" legislation that would allow railroad rights of

way to be "railbanked" and maintained as recreational trails until such time as the right of way

was needed for rail use.  Railbanking thus reflects a vital concern for the significant public

investment made in the creation of these corridors and thus serves to avoid the potentially

prohibitive costs of reassembling a fragmented transportation corridor.  That is, both the state

and federal laws recognize that these railway corridors were "painstakingly created over

several generations."  *See Reed v. Meserve*, 487 F.2d 646, 649-50 (1st Cir. 1973).  Today, it

would be virtually impossible for even a governmental entity (much less a private railroad

having no powers of eminent domain) to recreate this system once the right of way is

abandoned and sold, and bridges, tunnels, and other costly structures are destroyed.

As a result of the federal railbanking program, there are 103 open railbanked rail-trails

totaling 2,492 miles, and efforts are presently underway to acquire and preserve 114 additional

---

[3]    *See, e.g., Norfolk & W. Ry. Co.— Abandonment Between St. Mary's and Minster in Auglaize County, OH,* 9 I.C.C.2d 1015 (1993).  *See also Iowa Power — Const. Exempt. — Council Bluffs, IA,* 8 I.C.C.2d 858 (1990).

former railroad corridors as trails under the federal Railbanking Law.  This extraordinary success
is the result of strong state laws in support of the federal program.  Pennsylvania is no exception.
As set forth below, Pennsylvania statutes and jurisprudence strongly support the goals of the
federal Railbanking Law and recognize that railbanking and interim trail use *is* a valid railroad
purpose and, as such, these public uses are well within the scope of the rights of way at issue in
this case.

> **B.**    **The *Preseault* Decision and Applicable "Takings"**
> **Jurisprudence.**

In 1990 the Supreme Court unanimously held that the federal Railbanking Law was fully
constitutional on its face.  *Preseault*, 494 U.S. 1 at 19.  In doing so, the Court affirmed, on other
grounds, the decision of the Second Circuit, which had held that the Trails Act did *not* effect a
taking as a matter of federal takings law.  *Preseault v. ICC,* 853 F.2d 145, 151 (2d Cir. 1988).
The Supreme Court expressly declined to address whether the Railbanking Law effected a
taking, finding instead that any such claims should be resolved through the filing of
compensation claims under the Tucker Act, 28 U.S.C. § 1346(a)(1).  *Preseault*, 494 U.S. 1 at 16.

The Plaintiffs in *Preseault* then filed a compensation claim in the U.S. Claims Court
(now the U.S. Court of Federal Claims) under the Tucker Act.  Ultimately, the U.S. Court of
Appeals for the Federal Circuit held, in a plurality decision, that the Preseaults had a property
interest in the corridor under Vermont State law that was "taken" as a result of the federal
Railbanking Law.  *Preseault v. United States*, 100 F.3d 1525 (1996) (*en banc*) (*Preseault II*).
Significantly, this plurality decision turned on an analysis of state law and the Court expressly
declined to address whether the issuance of a NITU alone, absent interim trail use or any other
physical occupation of the corridor, would result in such a taking.  *Id.* at 1552.

- 4 -

## II.    ARGUMENT

**A.    RAILBANKING AND INTERIM TRAIL USE ARE VALID RAILROAD PURPOSES EVEN UNDER DEEDS CONVEYING A RIGHT OF WAY EXPRESSLY LIMITED TO RAILROAD USES.**

As a predicate to addressing Plaintiffs' claim for compensation under the Takings Clause of the Fifth Amendment to the U.S. Constitution, Plaintiffs must first demonstrate that they have a property interest under state law that could have been "taken" without compensation. *See Preseault I*, 494 U.S. at 21 (O'Connor, concurring).  The nature of Plaintiffs' property interest depends on the language of the deeds and/or the manner in which the underlying property was conveyed to the railroad, as interpreted by Pennsylvania law.   As the plurality decision in *Preseault II* acknowledged, "[o]bviously if the railroad owns the right-of-way in fee simple, there is no owner of a separate underlying property interest to claim the rights of the servient estate holder. And even if an easement rather than fee title is the nature of the property interest held by the railroad at the time of the conversion to a public trail, if the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose." *Preseault II,* 100 F.3d at 1552.

Here, the applicable conveyances are broad enough to encompass railbanking and interim trail use because these activities are recognized under Pennsylvania law as acceptable public uses of railroad rights of way.  Pennsylvania law also recognizes that railbanking is not an abandonment but is rather a valid railroad purpose.

**1.    Railbanking Negotiations Demonstrate An Intent To Preserve Rather Than Abandon a Railway Corridor, Precluding Any Reversion Of The Underlying Property Rights To The Plaintiffs.**

Even assuming, for purposes of argument, that Plaintiffs hold fee title to the underlying rail property, having conveyed only an easement to the railroad, or that Plaintiffs hold a valid future interest in the underlying land (*i.e.*, a right of reverter upon cessation of railroad use), this

- 5 -

property interest cannot be said to have been "taken" by the Railbanking Law unless, under state law, the railroad has abandoned its property interests in the corridor. Without an abandonment, there is nothing to ripen Plaintiffs' alleged property interests into a possessory right.

In Pennsylvania, it is well-settled that a railroad abandons a right of way only by evincing a clear intention to *permanently* cease using the rail corridor. *Buffalo Township v. Jones*, 571 Pa. 637, 644, 813 A.2d 659, 663 (2002) ("In order to establish the abandonment of a right of way, the evidence must show that the easement holder intended to give up its right to use the easement permanently."). Mere cessation of use, even for an indefinite period of time, does not amount to abandonment. *Thompson v. Md. & Penn. R.R. Pres. Soc'y*, 417 Pa. Super. 216, 223, 612 A.2d 450, 453 (1992); *Sabados v. Kiraly*, 258 Pa. Super. 532, 535, 393 A.2d 486, 487-488 (1978). As the court stated in *Sabados*:

> the evidence must clearly show some conduct on the ground by the holder of the right of way which manifests that he *intended* to abandon and give up permanently his right to use it. Such conduct must consist of some *affirmative act* on his part which renders use of the easement impossible, or of some *physical obstruction* of it by him in a manner that is inconsistent with its further enjoyment.

258 Pa. Super. at 535, 393 A.2d at 487 (emphasis in original) (quoting *Hatcher v. Chesner*, 422 Pa. 138, 221 A.2d 305 (1966)). Mere non-use "no matter how long continued, cannot manifest an intention to abandon the right," nor are the consequences of disuse such as failure to maintain or clear brush considered affirmative acts of abandonment. 258 Pa. Super. at 535, 393 A.2d at 487-488; *Quarry Office Park Assoc. v. Phil. Elec. Co.*, 394 Pa. Super. 426, 438, 576 A.2d 358, 363 (1990); *Buffalo Township*, 571 Pa. at 646, 813 A.2d at 665 (citing *Lawson v. Simonsen*, 490 Pa. 509, 518, 417 A.2d 155, 160 (1980); *see also Burnier v. Dep't of Envtl. Res.*, 148 Pa. Commw. 530, 534, 611 A.2d 1366, 1368 (1992).

Likewise, in the context of railroad rights of way, failure to maintain or repair existing tracks does not amount to an intent to abandon. *Birdsboro Mun. Authority v. Reading Co.*, 758

A.2d 222, 227 (Pa. Super. Ct. 2000). Even salvaging the tracks, ties, and other railroad material

does not necessarily constitute abandonment. *See Buffalo Township*, 571 Pa. at 646-47, 813

A.2d at 665; *Thompson*, 417 Pa. Super. at 223-24, 612 A.2d at 453; *see also Union Pacific*

*Railroad Company – Exemption – Abandonment of Service in McPherson County, KS,* 1997 STB

LEXIS 2931, at *9 (S.T.B. 1997) ("[D]iscontinuance and removal of the line's track and ties

cannot be construed as the consummation of an abandonment").[4] Nor is a Public Utility

Commission ("PUC") certification abolishing the crossing dispositive of whether a right-of-way

has actually been abandoned. *See Thompson*, 417 Pa. Super. at 227, 612 A.2d at 455. Thus,

none of these factors conclusively establishes abandonment under state law.

Additionally, conveyance of a railroad company's property interests to a "non-railroad"

does not constitute abandonment. *Quarry Office Park Assoc.*, 394 Pa. Super. at 439, 576 A.2d

at 365; *see also Burnier*, 148 Pa. Commw. at 534, 611 A.2d at 1368 (same). To the contrary, as

the Supreme Court found in *Buffalo Township*, "participating in ongoing negotiations with [the

local municipality] for the use of the land" was a factor demonstrating "that [the railroad

company] did *not* abandon the right-of-way." 571 Pa at 647-48, 813 A.2d at 665-66 (emphasis

added); *see also Birt v. Surface Transp. Bd.*, 90 F.3d 580, 588 (D.C. Cir. 1996) (finding that the

"contemporaneous and continued trail negotiations over a period of . . . months . . . suggested

that the railroad did not intend to abandon"). Thus, sales or transfers of railroad rights of way to

third parties do not amount to abandonment if the third-party has a continuing interest in

railbanking and formally declares its intent to railbank. *See Buffalo Township,* 571 Pa at 655,

---

[4]    *See also Union Pacific Railroad Company – Exemption  – Abandonment of Service in Morgan County, CO (Julesburg Subdivision)*, 1997 WL 33786 (S.T.B. 1997) ("While discontinuance of rail service, salvage of track, and tariff cancellation are actions often taken in connection with abandonment, they are also fully consistent with a lesser action of temporary cessation of rail operations *or trail use*. Thus, they are entitled to little weight where, as here, [the railroad's] actions demonstrate an intent not to abandon by its continued willingness to negotiate") (emphasis added).

813 A.2d at 637; *Burnier*, 148 Pa. Commw. at 534, 611 A.2d at 1368; *Quarry Office Park Assoc.*, 394 Pa. Super. at 439, 576 A.2d at 365.

Indeed, the Pennsylvania Supreme Court held that a railroad right of way can be converted to a recreational trail even without ICC/STB authorization if "the interim use is subject to restoration or reconstruction by the railroad company and the trail user is willing to assume full managerial, financial and legal responsibility for the management of such rights-of-way and for any liability arising out of such transfer or use." *Buffalo Township,* 571 Pa. at 654, 813 A.2d at 670. Moreover, the Court noted that its decision "furthers the legislative purpose [of the federal Railbanking Act] to promote interim trail use in order to preserve the railroad company's interest in the property, since [the township] will preserve the right of way for the railroad company's future use." *Id.*

Here, both Cameron and Elk Counties filed with the STB for issuance of a Notice of Interim Trail Use ("NITU") and attendant statements of willingness to assume financial responsibility for the rail line. Joint Statement of Facts at ¶¶ 9-10. Shortly thereafter, A&E filed a letter with the STB indicating its willingness to negotiate a railbanking agreement with these municipalities, including provisions for interim trail use. *Id.* at ¶ 11. Consequently, the STB issued the NITU and the negotiation period has been extended through January 13, 2007. *Id.* at ¶¶ 12, 17. While it is anticipated that eventually the rail line will be transferred to an interim trail user, no transfer has, as yet, occurred.

Thus, far from demonstrating any intent to abandon the railway corridor, these actions indicate a clear intent by the county authorities and the railroad to preserve the railway corridor for future use. *See Buffalo Township*, 571 Pa. at 647, 813 A.2d at 666 (finding that ongoing negotiations for use of the land and expressly retaining the right to reenter the land for future railroad use "demonstrated [the railroad company's] intent to *retain* an interest in the right of

way") (emphasis in original). Thus, railbanking and interim trail use are evidence of intent *not* to abandon a rail corridor.

Railbanking and interim trail use is intended to, and does in fact preserve railroad corridors for future rail service. It is important to emphasize that the trail use under the federal Railbanking Law is *interim* in nature. That is, trail managers must agree in writing that their right to use the corridor is "subject to possible future reconstruction and reactivation of the right of way for rail service." 49 C.F.R. § 1152.29(a)(3); *see Grantwood Vill. v. Mo. Pac. R.R. Co.*, 95 F.3d 654, 659 (8th Cir. 1996). The transferring railroad may apply at any time to the STB for permission to remove the corridor from the national railbank in order to reactivate rail service on the line. *See* 49 C.F.R. § 1152.29(d)(2). The railroad may then compel the interim trail manager to return the line and may launch rail service without filing an application for new service from the STB. "If and when the railroad wishes to restore rail service on all or part of the property, it has the right to do so and the trail user must step aside." *Georgia Great S. Div., South Carolina Cent. R.R. Co., Inc. – Abandonment and Discontinuance Exemption – Between Albany and Dawson, in Terrell, Lee, and Dougherty Counties, GA,* No. AB-389 (Sub-No. 1X), 2003 STB LEXIS 274, at *8 (S.T.B served May 16, 2003). Thus, railbanking and interim trail use, by its very nature, is a *bona fide* railroad purpose and represents a seamless continuation of the railroad activities consistent with the original instruments of conveyance. In other words, interim trail use triggers no lapse or reversion of rights even, for example, where the original conveyance granted a conditional right of way for "as long as" such property is used for a railroad or railroad purposes, because interim trail use *is* a railroad purpose.

As the Pennsylvania Supreme Court's decision in *Buffalo Township* recognizes, the decision to railbank itself negates any intent on the part of the railroad to abandon the line. By deciding to railbank rather than abandon its line, the railroad has intentionally refrained from completely divesting itself of all interest in the corridor, and instead has retained a residual

interest in the line as a result of which the railroad has subjected itself to certain continued

obligations as a common carrier with respect to the line. As the ICC has ruled:

> By consenting to the issuance of a CITU/NITU, a carrier agrees to forgo
> consummating the authorized or exempted abandonment. As a consequence, its
> common carrier obligation does not terminate. Instead, the abandoning carrier
> retains a residual common carrier obligation and transfers the right of way to the
> trail user, subject to the stipulation that the rail corridor remain available for the
> reinstitution of rail service.

*Norfolk & W. Ry. Co.— Abandonment Between St. Mary's and Minster in Auglaize County,*

*OH,* 9 I.C.C.2d 1015, 1017 (1993). As a result, the transferring railroad risks the possibility

that it will not be allowed later to abandon the railbanked line. *See also Iowa Power — Const.*

*Exempt. — Council Bluffs, IA*, 8 I.C.C.2d 858, 866 (1990).

At the same time, placing the corridor in the national railbank allows the railroad to

derive certain benefits should the railroad wish, in the future, to reinstitute rail service on the

line. By agreeing to place the corridor in the national railbank, the transferring carrier can, at any

point, apply to the STB for permission to remove the corridor from the national railbank in order

to reactivate rail service on the line. *Mo. Pac. R.R. Co. -- Abandonment -- Exemption C in St.*

*Louis County, MO*, No. AB-3 (Sub-No. 98X), 1997 STB LEXIS 2969 (S.T.B decided April 18,

1997); 49 C.F.R. §1152.29(c)(3).

For the railroad that operated the corridor prior to its being placed in the national

railbank, reactivation of rail service is a relatively simple administrative procedure that can be

accomplished quickly and with a minimum of cost or administrative review by the STB. *Id.* By

contrast, a railroad wishing to construct and operate a railroad line on a corridor that has been

fully abandoned – and, as a result, not placed in the national railbank – must go through a costly

and lengthy administrative process to secure the STB's discretionary permission to construct a

new line. The railroad must submit substantial financial, operational, environmental and energy

data and may be subject to a full adjudicatory administrative hearing. *See* 49 U.S.C. § 10901 and

- 10 -

49 C.F.R. Part 1150. Permission to reactivate service over a line where abandonment authorization has been fully consummated may ultimately be denied for any number of reasons. *See, e.g., Ind. & Ohio Ry. Co. — Constr. & Operation — Butler, Warren, and Hamilton Counties, OH*, 9 I.C.C. 2d 783 (1993). As the First Circuit stated, "[t]o assemble a right of way in our increasingly populous nation is no longer simple." *Reed*, 487 F.2d at 649. Accordingly, in this case the decision by the railroad to "railbank" the line and thus retain a property interest (as well as potential obligations) is significant evidence that the railroad made a deliberate decision not to abandon its interest in the line, in order to avail itself of the benefits – and obligations – attendant to railbanking.

## 2. Railbanking And Interim Trail Use Is Within The Scope Of Railroad Right Of Way.

Numerous courts, including the Supreme Court of the Commonwealth of Pennsylvania, have recognized that railbanking and interim trail use are within the scope of the railroad's right of way, and thus constitute a valid railroad purpose, even when no railroad is presently using that corridor. *See, e.g., Buffalo Township*, 571 Pa. at 654-55, 813 A.2d at 670. For example, in a case involving a railbanked corridor in Montgomery County, Maryland, the Maryland Court of Appeals (Maryland's highest court) held that neither the original grantor of a right of way nor the adjacent landowner had a right to compensation by virtue of the railbanking of the line because the scope of the right of way was sufficiently broad to include trail as well as railroad uses. *Chevy Chase Land Co. v. United States*, 733 A.2d 1055 (Md. 1999). After reviewing the facts of the case and considering Maryland authority concerning the interpretation of right of way transportation easements, the Maryland Court of Appeals found that:

> It is self-evident that the use of the right of way as a transportation corridor for walking, biking, and other transportation purposes, including its possible use in the future for light rail, imposes no new burdens on the servient tenements and does not result in the 'substitution of a different servitude from that which previously existed.'

*Id.* at 1077-78 (quoting *Reid v. Washington Gas Lt. Co.*, 194 A.2d 636, 638 (Md. 1963)). The Court not only found "the conversion of a railway used for freight to a footpath [to be] consistent and compatible with the prior railway use" but also found interim trail use to be "less burdensome than freight railroad use." *Id.* at 1080, 1094.[5]   Once the Court found that recreational trail use was a permissible railroad use and that the railroad had performed no acts abandoning that use, the servient estate holder could not show a property interest that had been impermissibly taken. *Chevy Chase Land Co. v. United States*, 230 F.3d 1375 (Fed. Cir. 1999).

Similarly, the Supreme Court of Minnesota has ruled that use of a railroad easement for biking, hiking, and jogging is within the scope of the easement. *State by Wash. Wildlife Pres., Inc. v. State*, 329 N.W.2d 543 (Minn. 1983). The Court construed a grant of a right of way to a railroad, and held that the "[u]se of the right of way as a recreational trail is consistent with the purpose for which the easement was originally acquired, public travel, and it imposes no additional burden on the servient estates." *Id.* at 545.  The Court found that the corridor in question had not been abandoned, and that "[r]ecreational trail use of the land is compatible and consistent with its prior use as a rail line, and imposes no greater burden on the servient estates." *Id.* at 547.  *See also Barney v. Burlington N. R.R.*, 490 N.W.2d 726, 732 (S.D. 1992) (conversion of railroad corridor to a trail constitutes conversion to a "public highway" for purposes of 43 U.S.C. § 912); *Hatch v. Cincinnati & I.R.R. Co.*, 18 Ohio St. 92 (1868) (converting a canal into a railroad does not extinguish the original easement). *See also Preseault I*, 494 U.S. at 15 n. 9 (citing cases).

The result here should be no different.  First, there has been no abandonment of the railway corridor under either state property law or the federal Railbanking Law.  Indeed, given

---

[5]   The court specifically rejected the original grantor's argument that the conveyance of a right of way to a railroad automatically indicates that the right of way is narrowly restricted to railroad purposes only. Id. at 1074.

A&E's ongoing negotiations with the counties and their trail sponsors,[6] Plaintiffs cannot seriously dispute the railroad company's continued interest in the railway corridor at issue. Second, the trail conversion contemplated in this case is a valid railroad purpose as a matter of law.[7]  That is, there has been no actual change in status or any termination of the railroad activities arguably contemplated in the original conveyances – transactions for which plaintiffs' predecessors received due consideration.  Therefore, such a conversion cannot constitute a federal taking as nothing has been physically "taken" from the plaintiffs.

3.    **Railbanking And Interim Trail Use Fulfill Important State And Federal Public Policy Goals.**

The act of converting railroad corridors to recreational trails – a conversion that is integral to the federal Railbanking Law's objective of preserving rail corridors – is an acceptable public use under Pennsylvania statutes, which expressly encourage railbanking and interim trail use of railroad rights of way and recognize those uses as public uses.  Indeed, Pennsylvania modeled its Rails to Trails program, 32 P.S. § 5611 *et seq.,* after the federal Railbanking Law, and gave the Department of Environmental Resources the authority to participate in rails to trails conversions for the purpose of developing "available railroad rights-of-way for public recreational use." 32 P.S. § 5613; *see also Buffalo Township*, 571 Pa. at 649, 813 A.2d at 667. The "State Act also gave counties or municipalities the right to accept title to available railroad rights-of-way conveyed by quitclaim deed or warranty deed." *Id.* (citing 32 P.S. § 5614(c)(2)). As described by the Pennsylvania Supreme Court:

_____

6    Joint Stipulations of Fact at ¶¶ 11, 18 (A&E agreed to Elk County's request to substitute West Creek Recreational Trail Association in place of the county as the trail sponsor).

7    *See St. Louis-S.F. Ry. Co. v. King*, 50 S.W.2d 94, 98 (Mo. 1932); *St. Louis-S.F. Ry. Co. v. Dillard*, 43 S.W.2d 1034, 1037 (Mo. 1931) (each holding that land retained by a railroad company for future railroad purposes was a legitimate railroad purpose and therefore could not be acquired by adverse possession); 16 U.S.C. § 1247(d) ("if such interim use is subject to restoration or reconstruction for railroad purposes, **such interim use shall not be treated**, for purposes of any law or rule of law, **as an abandonment of the use of such rights-of-way for railroad purposes**.") (emphasis added).

> [b]oth the National Act and the State Act display a strong legislative policy
> encouraging the preservation of railroad rights-of-way by using existing rights-of-
> way for interim recreational use.  The National Act accomplishes this directly by
> providing that "interim trail use" is a "discontinuance" rather than an
> "abandonment" of the prior railroad use, thus preventing the right of way from
> reverting under state law.  The State Act demonstrates its intent by giving
> counties and municipalities the right to accept title to the railroad rights-of-way.
> The inescapable effect of these Acts is to allow a railroad company to transfer its
> possessory interest in the land, i.e., the right of way, to a third party for the limited
> purpose of interim recreational use.  The interim trail user essentially holds the
> railroad company's land in trust until the railroad needs to reactive service on the
> line.  In this way, the legislature has effectively prevented the further loss of
> railroad track.  Thus, upon the conversion of a railroad line to a recreational trail,
> the railroad's right of way does not terminate but is held in abeyance, and thus,
> the land does not revert to the property owner.

*Id.* at 667 (internal citations omitted).

Pennsylvania courts also recognize that "land embraced within a railroad right of way is

held for public purposes." *A. D. Graham & Co. v. Pennsylvania Turnpike Comm'n*, 347 Pa. 622,

640, 33 A.2d 22, 31 (1943).  As such, a railway corridor may be deemed a "public highway,"

held "in trust for the people of the Commonwealth." *Lacy v. Montgomery*, 181 Pa. Super. 640,

652, 124 A.2d 492 (1956).  This protected status should not change in the context of a rails-to-

trails conversion that is expressly endorsed by the state legislation and state Supreme Court

precedent cited above.  This is especially true where, as here, no actual abandonment has

occurred and where courts have found interim trail use to be far less a burden on the adjacent

landowners, purportedly holding reversionary rights, than the railroad operations contemplated in

the original conveyance.  *See, e.g., Chevy Chase*, 733 A.2d at 1095.

Thus, Pennsylvania law clearly embodies a public policy that (1) railbanking and interim

trail use are consistent with the preservation of railroad corridors for future railroad use; and (2)

the State should encourage and support the conversion of rail corridors to public recreational use,

until such time as the corridors are needed for renewed rail service.  This unequivocal policy is

entitled to (and has received) substantial deference from Pennsylvania courts, and, by extension,

from this Court when it construes Pennsylvania law.  *See, e.g., Commonwealth of Pa. v. Kirkner*,

- 14 -

569 Pa. 499, 503, 805 A.2d 514, 516 (2002) (under Pennsylvania's Statutory Construction Act, statute cannot be modified by judicial discretion no matter how well-intentioned, and decision that contradicts the express intention of the legislature must be overruled).

Granting proper deference to Pennsylvania's well-articulated public policy in support of railbanking and interim trail use, it would be incongruous to find the rail corridor to be abandoned under state law where, as here, the railroad company continues to engage in railbanking negotiations with local municipalities. Indeed, such a conclusion would ignore recent precedent from Pennsylvania's highest court interpreting state law and public policy and determining that a railway corridor was not abandoned where such negotiations showed a clear intent not to abandon the right-of-way. *Buffalo Township*, 571 Pa. at 647-48, 813 A.2d at 665-66. Where the railroad cannot be deemed to have abandoned the railway corridor under state law or otherwise, the right of way has not and cannot revert to the adjacent estates. 571 Pa. at 650, 813 A.2d at 667 (holding that under both the federal and state rails-to-trails acts, interim trail use does not constitute abandonment and the land does not revert to the adjacent landowners). Without any cognizable abandonment that would trigger a reversion of rights under state law, the STB issuance of a NITU could not possibly have effected a taking of the Plaintiffs' land.

### B. UNDER THE APPLICABLE TAKINGS JURISPRUDENCE, THE LIMITED IMPACT OF THE FEDERAL RAILBANKING LAW ON PROPERTY RIGHTS WOULD NOT EFFECT A "TAKING" OF ANY PROPERTY INTERESTS IN THIS CASE.

Even if the Court were to find that Plaintiffs possess a property interest under Pennsylvania law, the Federal Circuit's decision in *Preseault II* does not compel a conclusion that Plaintiffs' property interest has been "taken" by the federal Railbanking Law. Indeed, *Preseault II* involved a *per se* taking – *i.e.*, where the alleged governmental action is not merely a restriction on how the claimant can use its property, but rather results in a permanent physical occupation of the claimant's property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458

U.S. 419 (1982); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1986).  By contrast, a regulatory

taking – without any physical occupation – requires the Court to conduct a balancing test to

determine whether a particular regulatory action goes beyond mere "regulation" and actually

effects a taking.  *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978);

*Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency,* 535 U.S. 302 (2002).

 In this case, despite the issuance of the NITU nearly four years ago, there has been no

physical occupation of the railway corridor by any non-railroad entity.  Since the corridor has not

been transferred for interim trail use, any "takings" claim that accrued when the NITU was

issued was merely a "temporary" takings claim and must therefore be analyzed under the three-

part balancing test for regulatory takings set forth in *Penn Central Transportation Co. v. New

York City*, 438 U.S. 104 (1978).[8]  Furthermore, if and when a trail use agreement is

consummated, the applicable appellate court precedent does not compel a conclusion that the

interim trail use is a physical occupation that constitutes a taking.

  **1.** **Any "Takings" Claim That Accrued When the NITU Was Issued Is
Merely A Temporary Takings Claim That Must Be Analyzed Under
the Three-Part *Penn Central* Test.**

 As set forth in the Joint Statement of Facts, the STB has issued and repeatedly extended

the NITU to give the railroad more time to negotiate the transfer of the corridor for interim trail

use pursuant to the federal Railbanking Law.  However, "the negotiating period has not yet

expired and no agreement regarding railbanking and interim trail use has been reached."  Joint

Statement of Facts at ¶ 19.  As a result, contrary to Plaintiffs' suggestion, there has not been any

"physical occupation," which is the only circumstance under which any court has held that the

Railbanking Law results in a taking.  Even the Federal Circuit in *Preseault II* expressly declined

to apply its analysis to the situation squarely presented by this case – where the STB has issued a

---

[8] Even if a trail use agreement is eventually consummated, this temporary takings issue is not mooted.
Whether there was a temporary taking during the years before trail use began will still affect a host of
questions, including the computation of damages and the accrual of interest over time.

NITU establishing a railbanking negotiating period, but no transfer to an interim trail manager has taken place:

> It is important to understand what we here decide, and what remains to be dealt with in future cases . . . We do not hold that every exercise of authority by the Government under the Rails-to-Trails Act necessarily will result in a compensable taking. . . . *Whether, at the time a railroad applies to abandon its use of an easement limited to railroad purposes, a taking occurs under an ICC order to "railbank" the easement for possible future railroad use, and allowing in the interim for use of the easement for trail purposes, is a question not now before us. We offer no opinion at this time on that question.*

*Preseault II*, 100 F.3d at 1552. (emphasis added).

No other "takings" case filed under the Tucker Act has addressed the question of whether railbanking alone, without the transfer of the corridor to the interim trail manager for trail use, constitutes a taking. To the contrary, other "takings" decisions, like *Preseault II*, emphasize that it is the trail use of the corridor by the public that constitutes the applicable taking. As the U.S. Court of Federal Claims explained in another case cited by Plaintiffs, "Whereas previously the Plaintiffs could exclude all but the railroads from use of the rights-of-way, *now the public at large has access. This is a physical taking of Plaintiffs' property.*" *Glosemeyer v. USA,* 45 Fed. Cl. 771, 781 (2000) (emphasis added).

Nor did the recent decisions by the U.S. Court of Appeals hold otherwise, even when recognizing that a takings cause of action "accrues" (for purposes of the Tucker Act's statute of limitations) when the NITU is issued. *Caldwell v. U.S.A.*, 391 F.3d 1226 (Fed. Cir. 2004), *cert. denied,* 126 S.Ct. 366 (2005); *Barclay v. U.S.A.*, 443 F.3d 1368 (Fed. Cir. 2006). The fact that the takings claim "accrues" when the NITU issues does not decide the question of whether the Plaintiffs will prevail on the claim that the issuance of the NITU alone results in a compensable taking. To the contrary, the Court in *Caldwell* recognized that railbanking/interim trail use "negotiations may fail, and the NITU would then convert into a notice of abandonment. *In these circumstances, a temporary taking may have occurred.*" *Caldwell*, 391 F.3d at 1234 (emphasis added). The Court then expressly noted, "*This case does not involve, and we do not herein*

*address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached.*" *Id.* at 1234 n. 7 (emphasis added).  Accordingly, this Court is presented with an issue of first impression.

> ### 2.    Issuance of A NITU Alone Does Not Constitute A Compensable Temporary Taking.

It is clear that the issuance of the NITU alone does not constitute a compensable taking of Plaintiffs' property.  It is well-established that a claim for a temporary taking is analyzed under the three-part test for regulatory takings established by the Supreme Court.  *Penn Central Transportation Co. v. New York City, cite, 438 U.S. 104 (1978); Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency,* 535 U.S. 302 (2002).

According to the Supreme Court, while there is no fixed formula for determining whether a particular regulatory action goes beyond "regulation" and effects a taking, the answer to the question will depend on a number of factors, including "the character of the governmental action, its economic impact, and its interference with reasonable investment backed expectations." *PruneYard Shopping Center v. Robbins*, 447 U.S. 74, 83 (1980); *see also, Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984); *Penn Central Transportation Co.*, 438 U.S. at 124.

The issuance of a NITU alone, without any transfer of the corridor to an interim trail manager for public use, does not in any way interfere with "reasonable investment backed expectations" of the Plaintiffs.  Since at least 1920, the Transportation Act of 1920 completely preempted any state-law based expectations that adjacent landowners might have had.  The 1983 federal Railbanking Law did not enlarge the broad and preemptive statutory powers that the Transportation Act of 1920 conferred on the ICC to decline to authorize abandonments of rail lines and discontinuance of rail service and to impose "such terms and conditions as in its judgment the public convenience and necessity may require."  49 U.S.C. § 10903(d).  After 1983, just as before, it has remained entirely the railroad's choice and decision whether merely to

discontinue rail operations "for an indefinite period while preserving the rail corridor for possible reactivation of service in the future," *Preseault I*, 494 U.S. at 6 n.3, or fully to abandon the right of way and thereby permit state law rights of reversion to take effect.[9]

Indeed, prior to 1983, the ICC frequently imposed conditions on abandonment certificates for the purpose of preserving transportation corridors for future rail (and in some cases highway) use, and its authority to do so was consistently upheld by the courts. *See Reed v. Meserve*, 487 F.2d at 649-650 (collecting cases). If the ICC declined to issue a certificate of discontinuance or abandonment, the line remained subject to ICC jurisdiction and parties could not insist that rights of way revert to them on the ground that abandonment had occurred as a matter of state law. *Louisiana & Ark. Ry. v. Bickham*, 602 F. Supp. 383, 384 (M.D. La.), *aff'd*, 775 F.2d 300 (5th Cir. 1989).

That is exactly what occurs where, as here, the STB issues a NITU, thereby delaying the effective date of abandonment authorization, and where no interim trail use agreement has been reached. In such circumstances, the railroad itself becomes the railbanking entity for the duration of the NITU's negotiating period. As the railbanking entity, the railroad may choose to permanently discontinue rail service and "railbank" the corridor itself by simply retaining control over the corridor for its own future use. Accordingly, the issuance of a NITU, alone, without any transfer of the corridor to an interim trail manager for public use, does not in any way interfere with "reasonable investment backed expectations" of the Plaintiffs, and cannot constitute a taking. That is, without any abandonment or transfer of the right of way there has been absolutely no ripening of any alleged reversionary interests, which obviously forecloses any reasonable expectation that such interests have ripened.

---

[9]    As the ICC noted: "A railroad's decision to enter into a Trails Act agreement is similar to a carrier's decision to seek discontinuance rather than full abandonment authority for a particular line." *ICC Policy Statement – Rail Abandonments – Use of Rights-of-Way As Trails*, 5 I.C.C. 2d 370, 371 (1989).

3.    **Interim Trail Use Pursuant to the Railbanking Law Does Not Constitute A Taking.**

Even if the railway corridor is ultimately transferred to an interim trail manager, the operation of state and federal laws here does not amount to a taking.  In determining a landowner's property rights and whether they have been "taken" by governmental action, courts must consider "existing rules or understandings that stem from an independent source such as state law" and other "relevant background principles."  *Lucas v. S. C. Coastal Council*, 505 U.S. 1003, 1030 (1992).  The "background principles" that define the scope of a claimant's property interests include federal as well as state law.  *See, e.g.*, *Scranton v. Wheeler*, 179 U.S. 141 (1900) (cited with approval in *Lucas*, 505 U.S. at 1029); *M&J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1994).

Applying these principles in deciding whether application of the federal Railbanking Law would result in a taking of the claimant's property in the circumstances described above, the Court needs to consider: (1) the nature of the interests acquired by the railroad from the claimant's predecessor; (2) the comprehensive scheme of federal laws and regulations that have governed the operation and disposition of railroad rights of way for more than eighty years; and (3) what additional burdens, if any, the application of the federal Railbanking Law imposes on the claimant's interest in the right of way.

Even the plurality decision in *Preseault II* acknowledged that federal law beginning in 1920 "has occupied the field of regulation of interstate railroad operations, preempting any pattern of conflicting state regulation," and also preempted "state-created property rights, including the rights to possession of property when railroad easements terminate."  100 F.3d at 1537.  Yet the Federal Circuit specifically rejected any suggestion that pre-1983 federal law was part of the "background principles" of law that *Lucas* and other cases instruct must be considered

- 20 -

to determine the scope of the claimant's property interests prior to the alleged taking. *Id.* at 1538-1539.

The Federal Circuit is unpersuasive here as it makes no sense to say that only state law, but not federal law, is relevant in establishing the scope of the property interests a person possesses before the alleged taking. Instead, as the Second Circuit held:

> The ICC has plenary and exclusive authority to determine whether it is appropriate under all the circumstances to allow a railway carrier to abandon a route, and if the ICC determines that abandonment is not appropriate, no reversionary interest can or would vest. Thus, petitioners' reversionary interest, if any, is not postponed any more by the operation of § 1274(d) than it could otherwise be affected by the ICC's continuing jurisdiction.

*Preseault v. I.C.C.*, 853 F.2d 145, 151 (2d Cir. 1988), *aff'd on other grounds*, 494 U.S. 1 (1990).[10]

Moreover, the Supreme Court's decision in *Lucas* clearly indicated that federal law *is* relevant for that purpose, when it stated: "[W]e assuredly *would* permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title" in defense of a taking claim. 505 U.S. at 1028-29 (emphasis in the original) (citing *Scranton*, 197 U.S. at 163 (finding that the Government's navigational easement was a pre-existing *federal* law limitation on a landowner's title)). Indeed, even the Federal Circuit itself has found that pre-existing federal law limitations on takings claimants' rights respecting their property are relevant in determining whether the challenged action constituted a taking. *M&J Coal*, 47 F.3d at 1154; *California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir.), *cert. denied*, 506 U.S. 916 (1992).[11]

---

[10]   As noted earlier, the Supreme Court affirmed the Second Circuit's judgment that the federal Railbanking Law was constitutional but declined to decide whether it could effect a taking because it concluded that, if it did constitute a taking, the claimant could obtain just compensation under the Tucker Act.

[11]   Other decisions after *Preseault II* that have found the issuance of a railbanking order by the STB to constitute a taking have simply followed the plurality opinion with little or no analysis of the issue under

Furthermore, as noted above, *Preseault II*, was a plurality decision joined by four judges.

Two other judges concurred on different grounds.[12]  Three judges dissented.  As noted in the

dissenting opinion, since no opinion of the court commanded a majority of the judges, the

decision has no precedential effect and is not controlling on this Court.  100 F.3d at 1555.  It is

well-settled that a plurality opinion such as *Preseault II* lacks precedential value.  *See, e.g. Texas*

*v. Brown*, 460 U.S. 730, 737 (1983); *Hertz v. Woodman*, 218 U.S. 205, 213-14 (1910).  Indeed,

the Court of Claims and Federal Circuit applied this principle in a recent takings case.

*Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 39-40 (2000), *aff'd* 271 F.3d 1327,

1339 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293 (2002).

The facts in *Preseault II*, moreover, were highly unusual and will not be replicated in this

case.  Unlike the rail line at issue in this case, rail service over the line in *Preseault II* had ceased

15 years, and the track had been dismantled for 10 years, before any application for

discontinuance and abandonment was made to the ICC.  In essence, the railroad that later sought

to transfer the right of way to a municipality under the federal Railbanking Law had committed

an unlawful discontinuance and abandonment in violation of federal law.[13]  Thus, the Federal

Circuit's decision is not controlling, is distinguishable on its facts, and should not be followed.

When the Court considers the very substantial rights originally conveyed to the railroad and the

long history of comprehensive federal regulation of the use and disposition of railroad rights of

---

federal takings jurisprudence.  Those decisions have focused almost exclusively on state law issues, such
as whether railbanking is a permitted use under easements limited to railroad purposes.  *Glosemeyer*, 45
Fed. Cl. at 777; *Toews v. U.S.A.*, 376 F.3d 1371 (Fed. Cir. 2004); Schmitt v. United States, No. IP 99-
1852-Y/S, 2003 WL 21057368 (S.D.Ind. Mar. 5, 2003).

[12]   Although the concurring judges did not identify their disagreements with the plurality opinion, one
basic difference is that the plurality opinion specifically held that the Transportation Act of 1920 and
other pre-1983 legislation were irrelevant in defining the property rights of the Preseaults and did not
effect a taking of their property (*see* 100 F.3d at 1537-1540), whereas the concurring opinion expressed
the opinion that the Transportation Act of 1920, the 4-R Act of 1976 and the Trails Act Amendments
were all "offending laws . . . each of which took . . . a share of the property right."  100 F.3d at 1553.

[13]   The plurality opinion rested in large part on its determination "that abandonment of the easements
took place in 1975" – 10 years before authority was sought from the ICC.  100 F.3d at 1549.

way, it must conclude that the limited additional impact of the federal Railbanking Law on the current successors to the original landowners does not under any circumstances amount to a taking of their property. Thus, the Court should find, as did the Second Circuit, that railbanking and interim trail use of a railroad right of way does not amount to a taking under the facts of this case, and the Court should dismiss the complaint.

### III.   CONCLUSION

For the foregoing reasons, the Court should grant the Defendant's Motion for Summary Judgment.

Respectfully submitted,

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP

By: _____
Neal R. Brendel
Pennsylvania Bar I.D. No. 31493
William D. Semins
Pennsylvania Bar I.D. No. 89550
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222-2312
(412) 355-6500
(412) 355-6501 fax

Of Counsel:

Andrea C. Ferster, General Counsel
RAILS-TO-TRAILS CONSERVANCY
1100 17th Street, N.W., 10th Floor
Washington, D.C. 20036
(202) 974-5142

Dated: January 19, 2007

Attorneys for *Amicus Curiae* Rails-to-Trails
Conservancy

## CERTIFICATE OF SERVICE

I hereby certify that, on this 19th day of January 2007, a copy of the foregoing Motion of Rails-To-Trails Conservancy For Leave to File *Amicus Curiae* Brief in Support of Defendant's Motion for Summary Judgment, and the attached *Amicus Curiae* brief, were served by first-class mail, postage pre-paid, on:

David A. Cohen
The Cullen Law Firm
1101 30th Street, N.W., Suite 300
Washington, D.C. 20007


Kristine S. Tardiff
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301


William D. Semins
Pennsylvania Bar I.D. No. 89550
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222-2312
(412) 355-6500
(412) 355-6501 fax