1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   ROBERT TROHA and FREDERICK    :
    BIGNALL,                       :
4              Plaintiffs          :
                                   :
5       v.                         :   Case No. 1:05-cv-00191-SJM
                                   :
6   THE UNITED STATES OF AMERICA   :
    and RAILS-TO-TRAILS            :
7   CONSERVANCY,                   :
               Defendants          :
8

9

10

11

12

13          Hearing in the above-captioned matter held

14     on Thursday, March 15, 2007, commencing at 1:30

15     p.m., before the Honorable Sean J. McLaughlin,

16     at the United States Courthouse, Courtroom C, 17

17     South Park Row, Erie, Pennsylvania 16501.

18

19

20

21

22

23

24
              Reported by Janis L. Ferguson, RPR, CRR
25               Ferguson & Holdnack Reporting, Inc.

```
1   For the Plaintiffs:
         David A. Cohen, Esquire
2        The Cullen Law Firm
         1101 30th Street, N.W.
3        Suite 300
         Washington, DC 20007
4
    For the Defendant United States of America:
5        Kristine S. Tardiff, Esquire
         U.S. Department of Justice
6        Environment & Natural Resources Division
         53 Pleasant Street
7        4th Floor
         Concord, NH 03301
8
    For the Defendant Rails-to-Trails Conservancy:
9        Andrea C. Ferster, Esquire
         Rails-to-Trails Conservancy
10       1100 17th Street, N.W.
         10th Floor
11       Washington, DC 20036

12       William D. Semins, Esquire
         Kirkpatrick Lockhart Preston Gates & Ellis
13       535 Smithfield Street
         Henry W. Oliver Building
14       Pittsburgh, PS 15222-2312

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3          Transcript of Proceedings   . . . . . . . . . . .   3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  This is the time that we have set for

2    argument on various motions filed in Troha versus United

3    States, at Civil Action No. 05-191-Erie.  And would everyone

4    be so kind as to identify themselves and their client for

5    the benefit of my court reporter.  Starting over here.

6          MS. TARDIFF:  Good afternoon, Your Honor.  Kris

7    Tardiff for the United States.

8          MR. SEMINS:  Your Honor, good morning.  Bill

9    Semins on behalf of Rails-to-Trails.

10         THE COURT:  Was that Semins?  I'm sorry.

11         MR. SEMINS:  Semins.

12         MS. FERSTER:  Andrea Ferster, general counsel for

13   Rails-to-Trails Conservancy.

14         MR. COHEN:  Good afternoon, Your Honor.  David

15   Cohen for the Plaintiffs.  And with me is Mr. Troha, the

16   Plaintiff.

17         THE COURT:  Nice to see you, sir.

18         MR. COHEN:  And his wife.

19         THE COURT:  Nice to see you, ma'am.  Everybody

20   came some distance today, I guess.

21              Well, we have a lot to cover here today.  And

22   let me preface our discussion by saying I have had an

23   opportunity to review these briefs and cases in some detail,

24   so I think I have -- at least a good working knowledge of

25   each side's position.

1                And just as a matter of -- just as an aside,

2       it may be of some passing interest, although not really

3       material to anything, to know that in the almost 13 years

4       I've been on the bench, until the last seven or eight

5       months, I never had a rail banking case, and all of a sudden

6       I have two that have been briefed and are in various stages

7       of development.  So we've had an opportunity to immerse

8       ourselves in this area of law.

9                I think, if memory serves, Mr. Cohen, you

10      would have filed your motion first.  Is that right?

11           MR. COHEN:  Yes, Your Honor.

12           THE COURT:  Well, since it doesn't really much

13      matter, but sometimes first is the way to do it, why don't

14      you come on up, and let's have a discussion about the issues

15      that are raised in your brief, and then I'm going to be

16      happy to hear from the other side.

17           MR. COHEN:  Thank you, Your Honor.  May it please

18      the Court, my name is David Cohen, and I represent the

19      Plaintiffs in this case.

20                As Your Honor has indicated, the Court is

21      familiar with the -- the facts of the case, so I won't

22      belabor that.

23           THE COURT:  Let's begin our discussion this way:

24      And I have a tendency to ask a lot of questions, and

25      sometimes I'm concerned that people don't get a chance to

1    tell me what they want, but I am always going to give you an

2    opportunity to do that, either by way of direct answering my

3    question or at the end.  So let's rise above the trees,

4    first of all, and look down at this thing.

5              As I understand it, the genesis, if you will,

6    of this controversy -- and most of the taking controversy --

7    controversies involving the Rail Banking Act involve

8    comments made by Justice O'Connor in a concurring opinion in

9    the Preseault United States Supreme Court case.  And in that

10   case, the Justice essentially opined that -- or left open

11   the door for a takings claim.

12             And it's your position in this case, as I

13   understand it, that but for the operation of the -- and I'm

14   just going to refer to it loosely as the rail banking law.

15   But for the operation of that law and all of its

16   particulars, including the federal impact that it may have

17   on abandonment, that but for the operation of that act, the

18   property interests, the reversionary property interests

19   enjoyed by your clients along this 18.9-mile stretch of rail

20   would have reverted under -- under Pennsylvania law.  And

21   since the reversion was, quote, stopped, if you will, or

22   prevented by virtue of this Act, a takings claim under the

23   Fifth Amendment arises.

24             That's your essential position.  Is that

25   correct?

1          MR. COHEN:  I think that's fair to say, Your

2    Honor, yes.

3          THE COURT:  All right.  There are so many places

4    we could begin our discussion, but if I can lay my hand --

5    just bear with me a second.

6              Now, a large portion of your brief was

7    directed at the question of abandonment.  And, of course, it

8    strikes me that if, in fact, there had been an abandonment

9    of the railroad line by A & E, that is one way -- that is

10   one way that the property could have reverted to the

11   property owners.

12             Alternatively, though, tell me if this is

13   true:  Isn't the concept of a -- and I'm going to use this

14   term very loosely -- a nonconforming use, if you will, a use

15   of the easement now for something that exceeded the original

16   purposes, that's an independent way, isn't it, for the same

17   purpose to be accomplished?

18         MR. COHEN:  That is correct, Your Honor.  I --

19         THE COURT:  Although you didn't push it that much

20   in your brief, the other side joined issue on the question

21   of public use and shifting use.  And that's a distinct

22   issue, isn't it?

23         MR. COHEN:  Yes, Your Honor.  I think it's

24   important for the Court to look at the actual deeds and

25   condemnation documents that are at issue in this case.

1          THE COURT:  Let's start there.  And then I'm going

2    to -- I want to -- we'll talk about that, and then I want to

3    begin my discussion with you with a rather in-depth

4    discussion of Buffalo II, and I want to get your reaction to

5    Buffalo II.

6              Now, first of all, I assume for purposes of

7    our discussion, you would concede that any of the fee simple

8    absolutes, they are off the table.

9          MR. COHEN:  Yes, Your Honor.  And the Plaintiffs

10   have stipulated to that.

11         THE COURT:  Yes.  Now, we then are left with a

12   number of -- a number of easements that appear to be --

13   appear to be characterized as follows:  Some are easements

14   for railroad purpose.  Is that correct?

15         MR. COHEN:  I believe, Your Honor, that they are

16   all easements for railroad purposes.

17         THE COURT:  All right.  Is it of any legal moment,

18   in terms of your position here, if they are all

19   characterized as easements for railroad purpose, or only

20   some are characterized that way, and others are

21   characterized as determinable easements?

22         MR. COHEN:  It would depend on the nature of the

23   language in the fee simple determinable -- for example, the

24   Halsey deed, which I believe is Exhibit 19, is -- the

25   parties stipulated to certain deed categories.  And that is

1    a deed under Category II, a deed -- warranty deeds with "so

2    long as" language.

3              And in that instance, Your Honor, if you look

4    at that deed, there's actually language in the deed -- and I

5    didn't point this out in the brief.

6              But it's apparent, if you look at the deed,

7    that there was language that was handwritten by the grantor

8    that states in the granting clause where he grants the land

9    to the -- it was the Sunbury & Erie Railroad Company, a

10   strip of land for rods and width, as long as the same is

11   used as a railroad.  And when not so used, to revert back to

12   Halsey, his heirs, or assignees.

13             THE COURT:  Now, maybe the way to sharpen the

14   focus is as between you as the Defendants, you have agreed,

15   have you not -- or maybe you haven't -- on the legal nature

16   of some of these easements?

17             MR. COHEN:  Well, we've agreed -- we have agreed,

18   first of all, that certain deeds are conveyed fee simple

19   title to the railroad.  So those are not part of the case.

20             THE COURT:  All right.

21             MR. COHEN:  The remaining deeds, we have

22   categorized them.  The parties --

23             THE COURT:  Some are warranty deeds.

24             MR. COHEN:  Right.  Some are warranty deeds.  We

25   have -- we have a good portion of the corridor, Your Honor,

1    what was condemned by the railroad --

2              THE COURT:  So some of these easements were given

3    birth in a warranty deed.  Some were as a result of

4    condemnation proceedings.

5              MR. COHEN:  Right.

6              THE COURT:  Some were, according to you, easements

7    for railroad purposes and railroad purposes only.  Have I

8    missed another broad category of deed?

9              MR. COHEN:  There are grant deeds with release

10   language.  And then also we have a good part of the corridor

11   that -- where there are no conveyancing instruments; where

12   essentially the railroad acquired the property by adverse

13   possession.

14             THE COURT:  All right.  Well, did that adverse

15   possession, then, ripen into a fee simple absolute?

16             MR. COHEN:  No.  Under Pennsylvania law, I

17   believe, Your Honor, it's fairly clear that if the railroad

18   takes property -- well, it would depend, again, on the

19   Charter or the Act.  Here it would be under the Railroad Act

20   of 1849.  And there's cases -- we have cited them -- that

21   stand for the proposition that the railroad could only

22   obtain that which it could obtain under the charter by

23   condemnation.

24                  So it's the equivalent of condemnation,

25   except we don't have the condemnation proceedings like we do

1    in two of these instances, where the condemnation

2    proceedings actually talk about what the Board of Viewers

3    valued the property for, which was for railroad purposes.

4              THE COURT:  All right.  And so tell me if this is

5    right:  As part of my charge in resolving this case, and

6    perhaps in every takings claim, where there is a collision,

7    if you will, between the interests being served by the

8    railroad -- Rail Banking Act and the private property

9    owner's interests, it's necessary for the Court to go back

10   to the original deed instruments.  Is that correct?

11             MR. COHEN:  Absolutely, Your Honor.

12             THE COURT:  All right.

13             MR. COHEN:  I believe that's the case.  And I

14   believe if you look at the fairly recent decision of the

15   Federal Circuit in the Thaves case --

16             THE COURT:  Because you have to figure out, as

17   best as one can, I suppose, what interests were, in fact,

18   being conveyed.

19             MR. COHEN:  That's right, Your Honor.  Ultimately

20   this goes back to what did the grantor grant to the

21   railroad.  Because the railroad cannot convey interest it

22   does not have.

23             THE COURT:  Now, let's talk -- we're going to talk

24   about Buffalo Township II.  And, to me, there are -- first

25   of all, let's talk about Buffalo Township II.  Insofar as

1    that case may impact on your abandonment issue -- on your

2    abandonment claim, Buffalo Township is problematic for you

3    in that regard, isn't it?

4              MR. COHEN:  Well, it's distinguishable.

5              THE COURT:  Maybe.  But in a perfect world,

6    everybody gets -- every litigant has to take the cases as

7    they come on.  In a perfect world, it would be, from the

8    standpoint -- from the standpoint of the Plaintiffs, from

9    the standpoint of the issue of abandonment, your path would

10   be less rocky if Buffalo II didn't exist.

11             MR. COHEN:  I certainly would agree with that.

12             THE COURT:  All right.  How does one distinguish

13   it?

14             MR. COHEN:  Well, in Buffalo Township II, first of

15   all, I think you have to take a step back and look at the

16   facts of that case.  That was a case where the landowners

17   blockaded the trail, and the Township sought for and

18   obtained --

19             THE COURT:  Injunction.

20             MR. COHEN:  -- injunction.

21             THE COURT:  And they got it.

22             MR. COHEN:  Right.  They received it.

23             THE COURT:  But the blocking of the trail -- the

24   genesis is of less moment to me, because the reason for the

25   blocking of the trail was a claim that the reversionary

1    interests had kicked in, just like here.

2            MR. COHEN:  That's -- that's correct.  That's

3    correct.  In terms of the analysis, though, first the

4    Court -- well, the Trial Court, the Court of Common Pleas,

5    made the finding of fact, which under Pennsylvania law, the

6    question of abandonment is typically for -- for the jury.

7            THE COURT:  I was going to ask you about that.

8    There's a long line of authority to that effect.

9            However, apparently in that case, it did not

10    cause the Appellate Courts any undue pause, because they

11    went ahead and decided it anyways.

12            But would you agree -- well, let me put it

13    this way:  If there are two components of abandonment under

14    Pennsylvania law, and that is a permanent intention to

15    abandon, coupled with external acts that are reflective of

16    that, would you agree that on undisputed facts, it is

17    appropriate for a Court to take that issue from the jury?

18            MR. COHEN:  You mean in this particular case?  In

19    a takings case?

20            THE COURT:  How about this case?

21            MR. COHEN:  Yeah, in this case, we are not

22    entitled --

23            THE COURT:  Because you've -- you're not entitled

24    to, and I've got to resolve it as it is.  But that having

25    been said, isn't it arguable that the indicia of abandonment

1    or lack of indicia of abandonment in Buffalo II was not

2    dissimilar from what's going on in this case?

3            MR. COHEN:  Well, it was similar in the sense that

4    it involved rail banking.  And the Court did find --

5    remember, the Trial Court found that Conrail did not have

6    the intent to abandon the corridor based on certain facts

7    before the Court in that case.  And --

8            THE COURT:  One of them was a reversionary

9    interest that was specifically -- no, a right to re-enter,

10   if you will, that was specifically maintained in the

11   quitclaim deed that was given.  And the other one was the

12   very process of negotiation that was going on.

13           MR. COHEN:  That's correct.  And then on the other

14   side, it -- I believe in favor of abandonment, was the

15   railroad's petitioned to abandon the line before the Surface

16   Transportation Board.

17           THE COURT:  All right.

18           MR. COHEN:  In this case, though, Your Honor, what

19   we have here -- first of all, I would say in terms of the

20   intent, the railroad's intent to abandon, I think, in this

21   case is stronger on the facts than that in Buffalo II.

22           First of all, you have not just the

23   railroad's application for abandonment with the Surface

24   Transportation Board, but also in its application, it

25   affirmatively states, because there's been no traffic on

1    this line since 2001, no common carrier traffic since 1985.

2              THE COURT:  Right.

3              MR. COHEN:  That the railroad explicitly stated

4    that there is no alternative to abandonment.

5                   So that, I think, is a strong indication of

6    the railroad's intent to abandon because it is not

7    economically feasible for -- for the railroad in any

8    foreseeable future to run freight on that line.

9              THE COURT:  Let me ask you this:  And I think you

10   make fair points there.  Of course, nonuse in and of itself

11   is not sufficient under Pennsylvania law.  As a matter of

12   fact, it seems to me Buffalo Township goes out of their way

13   to indicate that no single factor is determinative.  That

14   constellation of things.

15             MR. COHEN:  Yes, that's correct, Your Honor.  And

16   that's why I think the Court does have to take into account

17   the entire constellation of facts.

18                  Buffalo II, the Court did go out of its way,

19   I think, to say that in that case, the Trial Court did not

20   error, the Court was not going to disturb the findings of

21   the Trial Court.  But in this case, we have several factors

22   both on the actual acts and on the intent that we don't have

23   in Buffalo II.

24             THE COURT:  Now, a little bit off the discussion,

25   but we're going to get right back to Buffalo II.  Given the

1  present procedural posture of this case, the first thing

2  that once I finally figured out what was going on and

3  assimilated the facts as best as I could, it was a ripeness

4  question for me.

5          And this is why I say that:  The rail banking

6  process, whatever its ultimate conclusion may be, has not

7  yet run its course.  And the thing that gives me a little

8  pause in this case, putting aside the invitation by the

9  amicus curiae to weigh in on this issue that's never been

10  decided, and that is whether or not the mere issuance of an

11  NITU is significant to trigger a takings claim, but putting

12  that aside, here is my question:  Aren't we all potentially

13  tilting at windmills here if it should come to pass that

14  come April 3rd or April 4th, whenever the next extension is

15  that has been -- and there's been multiple extensions over

16  the last three or four years.  If the railroad and the WCTRA

17  or whatever the name of the group that stepped into the one

18  County's shoes and the other county, are unable to come to

19  an agreement, well, then the railroad is free to abandon, at

20  which point the STB loses its jurisdiction, and you will

21  then have at that point, it seems to me, conclusively,

22  precisely what you're trying to get now.  Aren't we a little

23  early here?

24          MR. COHEN:  You know, Your Honor, I -- I share the

25  Court's sentiments on that score.

1              THE COURT:  It's almost an Article III

2    justiciability issue.

3              MR. COHEN:  Well, here's the procedural quandary

4    that we're in, so to speak, Your Honor:  We have a decision

5    from the Federal Circuit, Caldwell versus United States.

6              THE COURT:  Right.

7              MR. COHEN:  You know, that case prompted the

8    timing of the filing of this suit.

9              THE COURT:  All right.  In what respect?

10             MR. COHEN:  Well, in Caldwell, the Federal Circuit

11   held that the cause of action --

12             THE COURT:  Accrues?

13             MR. COHEN:  -- accrues when the NITU is issued.

14   It's a bright line.  The statute of limitations starts

15   ticking from that date.  The Federal Circuit held that

16   that --

17             THE COURT:  But what sense does that -- this is

18   why that makes no sense to me:  And I'll tell you why.

19   Because in every other instance -- and this is with all

20   respect to the Circuit Court.  But in every other instance I

21   can think about where the issue is when does a cause of

22   action accrue, there has been damage contemporaneous with

23   the accrual.

24                  Here, you could have a -- what is the statute

25   of limitations, by the way?

1          MR. COHEN:  It's six years, Your Honor.  And we

2     waited two years, thinking that -- it wasn't as if we filed

3     suit the day after the NITU was issued.  We waited two

4     years.  Also, I have never seen an instance where they have

5     strung it out -- they have asked for nine extensions --

6          THE COURT:  So, actually, what you're doing is

7     this was a pre-emptive move to protect -- to protect a

8     limitations argument against you, isn't it?

9          MR. COHEN:  In part, yes.  We didn't want to sit

10    on our rights and have -- because there's -- there's been a

11    subsequent ruling by the Federal Circuit reaffirming

12    Caldwell.

13         THE COURT:  But that doesn't -- and I'm not

14    quibbling with the theory behind it at all.  It seems like

15    reasonable lawyering to me.  But it still leaves -- it

16    doesn't address the question, though, does it, whether we

17    have all got our horses out of the barn too soon here;

18    whether there's a general case in controversy yet, does it?

19         MR. COHEN:  Well, I certainly understand what the

20    Court is saying.  And I do think, for example, if --

21         THE COURT:  Because the last chapter has -- the

22    last and most important chapter hasn't been written yet.

23         MR. COHEN:  I agree with that, Your Honor.  And

24    if, as Your Honor suggested -- one possibility would be that

25    after -- you know, after this last extension -- and by the

1    way, we intend to ask to petition the Surface Transportation

2    Board not to grant any further extensions, and if they

3    cannot reach an agreement, then the need to operate as a

4    notice of abandonment, and my clients would be much happier

5    to actually -- to be able to go in and file a quiet title

6    action in Court of Common Pleas and get the land back.

7    That's what they really want, is the land.  Compensation is

8    a poor substitute for that.  But that's all that they have

9    under the ruling of Preseault, U.S. Supreme Court finding

10   that this rail banking statute is constitutional --

11          THE COURT:  So they really want -- and not just

12   speaking for the lead Plaintiffs here, Troha, but you're

13   saying for your entire class, they are not interested in --

14   in a perfect world, they don't necessarily ever want to see

15   a day where they are sitting in a courtroom on damages.

16   They want the land back.  Is that right?

17          MR. COHEN:  That's right, Your Honor.  A lot of

18   them have been expecting to get this land back.  They --

19   they believe that -- you know, that under Pennsylvania law,

20   they are entitled to get it back, and but for the Rail

21   Banking Act, they would have gotten it back.

22             So -- but, again, because of the Caldwell

23   decision, you know, we waited a couple years.  And also, you

24   know, the -- you know, many of the landowners are elderly.

25          THE COURT:  Yes.

1              MR. COHEN:  There's a limit as to how long we can

2       wait.

3              THE COURT:  I understand.  I take it that -- I

4       take it that there have been no quiet title actions filed in

5       Common Pleas Courts.

6              MR. COHEN:  No.  No, Your Honor.  And I -- and I

7       think it would be almost the equivalent of Rule 11 to file

8       one now.  I don't think there's a good-faith basis in the

9       law to file one while this NITU is still in effect.

10             In fact, the landowners have no claim to that

11      property now.  They have no claim to possess -- to exclusive

12      possession of the property now.  They are in this twilight

13      zone.

14             THE COURT:  All right.  All you can get on the

15      Federal side here is a takings claim, right?  A money damage

16      claim.

17             MR. COHEN:  Yes.  That is correct.

18             THE COURT:  Well, putting aside the ripeness

19      issue, then, I think you and I both recognize the issue --

20      and I'm going to chat with the Defendant about it.  Let's

21      resume our discussion, then, of Buffalo Township.

22             The other argument of the Defendant here

23      which they raise in opposition to your contention that a --

24      their -- a taking has occurred is that -- and these two

25      arguments might kind of partake of each other.  But one is a

1    shifting public use argument.  And the other is, it seems to

2    me, a first cousin of it, but it is that from the get-go,

3    there was inherent in these easements the right,

4    quote/unquote, for the property to evolve into rail banking

5    and/or interim trail use.  Similar concepts, but maybe

6    slightly different.

7              Now, what does it say to you -- and before I

8    go right back to Buffalo Township -- that Pennsylvania

9    itself has passed a Rails-to-Trails Act?  Isn't that, if

10   nothing else, a rather clear legislative indication that the

11   Pennsylvania legislature espouses a shifting public use

12   doctrine?

13        MR. COHEN:  I would disagree with that, Your

14   Honor.  I don't -- in fact, many states have State

15   Rails-to-Trails Acts.

16        THE COURT:  That mirror the Federal Act?

17        MR. COHEN:  That mirror the Federal Act.  And, in

18   fact, the Federal Circuit has opined on that both in the

19   Preseault II case and, most recently, in the Thaves case.

20   And in both instances, the Federal Circuit held that State

21   action cannot deflect the -- cannot deflect from the Federal

22   Government's responsibility for a taking under the Fifth

23   Amendment.

24              In terms of -- but to answer the Court's

25   question directly, does the fact that Pennsylvania has a

1    State Rails-to-Trails statute suggest that there is a

2    shifting public use, I -- I disagree with that conclusion,

3    because there's nothing inherent in the fact of a -- of a

4    State Rails-to-Trails Act that suggests that the

5    Pennsylvania legislature has decided to reinterpret deeds in

6    a way that radically departs from traditional concepts of

7    property law that have been adhered to by the Courts of the

8    Commonwealth for the past 200 years.

9         THE COURT:  But would I be reading Buffalo

10   Township for more than it's worth when -- well, first, let

11   me just quote a few sentences from the opinion, and then we

12   can talk about it more intelligently.

13        The Court says here at Page 659 of the

14   Atlantic 2d. site, "Both the National Act and the State Act

15   display a strong legislative policy encouraging the

16   preservation of railroad rights-of-way by using existing

17   rights-of-way for interim recreational trail use."

18        Well, no surprise there.  That's exactly what

19   it's all about.

20        The Court goes on to say, "The National Act

21   accomplishes this directly by providing that," quote,

22   "interim trail use," closed quote, "is a discontinuance,"

23   open quote, "rather than an abandonment," close quote, "of

24   the prior railroad use, thus preventing the right-of-way

25   from reverting under State law."

1          Preseault.  "The State act demonstrates its

2    intent by giving counties and municipalities the right to

3    accept title to the railroad rights-of-way.  The inescapable

4    effects of these acts --" and this is, to me, the meat and

5    potatoes of this whole decision.  "The inescapable effect of

6    these acts is to allow a railroad company to transfer its

7    possessory interest in the land, i.e., the right-of-way, to

8    a third party for the limited purpose of interim

9    recreational trail use.  The interim trail user essentially

10   holds the railroad company's land in trust until the

11   railroad needs to reactivate service on the railroad line.

12   In this way the legislature has effectively prevented the

13   further loss of railroad track.

14          "Thus, upon the conversion of a railroad line

15   to a recreational trail, the railroad's right-of-way does

16   not terminate, but is held in abeyance, and, thus, the land

17   does not revert to the property owner."

18          Isn't the Court -- isn't the Court saying

19   there, among other things -- or isn't it espousing the

20   principle that the right to use -- the right to transform a

21   right-of-way that had previously been used as a railroad

22   into, for instance, an interim trail use, is not an

23   inconsistent use sufficient to work a reverter to the

24   property owners?

25          MR. COHEN:  I think the Court is reading the

1    language that you quoted a bit too broadly, Your Honor.

2              THE COURT:  All right.

3              MR. COHEN:  I read that --

4              THE COURT:  How do you read it?

5              MR. COHEN:  You know, Your Honor, I read it

6    basically as a matter-of-fact description of how the Rail

7    Banking Act actually -- how it mechanically works.  The Act

8    itself specifically states that the rail banking process

9    precludes abandonment under State law.  You know --

10             THE COURT:  And if you're right -- and you might

11   well be -- that all they were doing there was explaining

12   what the theory actually is, as opposed to adopting it

13   themselves -- but the fact remains -- but the fact remains

14   this:  Not only did the Court not find an abandonment, which

15   could have worked to -- worked to effectuate a reversion in

16   that case, but implicitly, at least, the Supreme Court of

17   Pennsylvania must have found that rail banking and interim

18   trail use are not inconsistent with the underlying easement.

19   Otherwise, it would have reverted on an independent basis,

20   wouldn't it?

21                  That's what I'm having a problem with.  And

22   I've read that case four times, and I end up at that same

23   place.  The Supreme Court -- as a matter of fact, that was

24   one of the issues that got teed up in the front, although

25   they didn't specifically address it.

1              In order for you to be right, the Supreme

2    Court would had to have found in favor of the property

3    owners at least on the issue of what is the inherent nature

4    of the easement right, wouldn't it?

5              MR. COHEN:  I -- I -- to be honest with you, Your

6    Honor, I have trouble with the concept -- with that concept

7    because the Court started from -- from the proposition that

8    the Trial Court did not error in finding that there was no

9    abandonment.

10             THE COURT:  Right.

11             MR. COHEN:  And that finding was really the key

12   finding that the Supreme Court relied upon.  That was the

13   key -- in other words, the finding by the Trial Court that

14   there was no intent by Conrail to abandon was the central

15   holding of the Supreme Court in finding that there were no

16   reversionary interests that actually came to fruition.

17             The statements that the Court read, I think,

18   basically explain how rail banking works.  But to the extent

19   that there may have been something that was implied in the

20   Supreme Court's decision --

21             THE COURT:  It must have been, though, at least

22   implied, because -- because as they are leading into their

23   opinion, they -- they tee the issue up like this:  Even

24   though they may not have done a good job in addressing the

25   second.  It says, "Buffalo Township responds that the land

1    was not abandoned at the time of the quitclaim deed, thus,

2    Conrail properly transferred its interests in the property.

3                    "Further, the National Act and the State Act

4    allows the transfer of the property.

5                    "Alternatively, Buffalo Township offers that

6    case law from Pennsylvania allows a railroad company to

7    transfer the land to further a public use or purpose.  In

8    this case, the transfer serves such purpose, and, thus, the

9    property did not revert to the underlying landowners."

10                   The issue was clearly there, wasn't it?

11            MR. COHEN:  Well, it certainly was -- it was

12    argued by -- it was --

13            THE COURT:  But your point, it was decided on a

14    narrow issue.

15            MR. COHEN:  It was.

16            THE COURT:  It was decided on abandonment.

17            MR. COHEN:  It was.  Absolutely.  I think if you

18    look at what the holding of the Court was, it was on a much

19    narrower ground that the railroad -- that Conrail did not

20    have the intent to abandon, based upon the fact that it was

21    engaged in negotiations with the trails group and that it

22    had a deed that allowed it to reoccupy -- reenter the

23    property to --

24            THE COURT:  This is somewhat of a rhetorical

25    question, because I know you agree with the Preseault

1    Circuit decision; Preseault II.  But let me ask it anyways.

2                 Is it arguable that Preseault was wrongly

3    decided in this sense:  That Preseault and cases like

4    Preseault overlook the fact that conduct inconsistent with a

5    permanent intention to abandon which comes about as a -- as

6    a result of the Rail Banking Act may be precisely the type

7    of conduct that State law would also look to, to determine

8    whether or not there was a permanent intention to abandon?

9    It gets a bit circular, doesn't it?

10         MR. COHEN:  It certainly does.  It certainly does.

11    I see where -- I do see what Your Honor is saying.

12                 From my standpoint, the holding of Preseault

13    by the Federal Circuit and Thaves, that -- they have -- the

14    Federal Circuit has, in its infinite wisdom, decided what

15    the law is in terms of taking, and we have to apply it.

16         THE COURT:  When you talk about indicia of

17    abandonment in this case, I'm going to borrow a phrase that

18    pops up everywhere.  That the bundle of sticks that goes

19    into the abandonment question, isn't it important that we

20    talk about permanent intention?  Because as long as -- as

21    long as a grantee retains either by way of deed, such as in

22    Buffalo Township, or expresses the desire to be able to

23    reenter and just throw that other entity out on their ear,

24    either by way of private deed, private contractual

25    relationship, or by operation of law, you can't have a

1    permanent intention to abandon, can you?

2           MR. COHEN:  Well, here's where I think the --

3    there is a -- somewhat of a circular reasoning.

4           THE COURT:  Unless -- and then I'll let you finish

5    your point -- unless your answer to that is it's a ruse,

6    because it's never going to happen anyways.

7           MR. COHEN:  Well, you know, I think there is

8    something to that.  And if you -- if you look at in the

9    Thaves case, and even though it was a -- a California trail,

10   a lot of the principles, I think, are equally applicable

11   here, in terms of the Federal takings jurisprudence.  And

12   what the Court there said is that there is a reality test in

13   takings claims.  And, specifically, that if there is no --

14   if there is no --

15          THE COURT:  Reasonable prospect?

16          MR. COHEN:  Yeah.  If there is no reasonable

17   prospect of having --

18          THE COURT:  Isn't that a dangerous slippery slope

19   to get on, though?  I mean, I don't even know how that's

20   workable in the real world.  How likely need likely be?  One

21   of those types of things.  I mean, I instinctively move away

22   from that.  I mean, I just don't know how to handle it.

23              But it -- what happens in our case -- and I'm

24   not saying it would.  But just hypothetically, I mean, the

25   railroad can read the tea leaves and can read the cases as

1   well as anybody else, I suppose.  What happens if in

2   addition to whatever may operate as a matter of law in

3   connection with the rail bank language concerning a right of

4   reentry, what if the -- what if they do come to a deal with

5   either the County or the trail association, and they say,

6   oh, by the way, we'd like something in our -- we'd like

7   something put in this deed; we'd like the same language that

8   went in the deed in Buffalo II, and we're serious about it?

9   What does that do?

10          MR. COHEN:  Well, Your Honor, I think at that

11  point you get to -- you get to the point where you can't

12  have essentially the -- the Act itself being used to prevent

13  a taking that arises from the Act.  And that's really where

14  I think the Buffalo II Court comes very -- you know,

15  remember, Buffalo II is not a takings case.  We're in a

16  different position --

17          THE COURT:  Buffalo II was not.  But the predicate

18  for Buffalo II is the same thing you have to establish here

19  in order to get the takings.  And, actually, would it --

20  would it be a stretch for me to say that Buffalo II is

21  arguably stronger for the Defendants here because they

22  didn't even comply with the NITU in Buffalo II?  And the

23  Court seemed to overlook that on the basis that that doesn't

24  matter, because, really, the STP's involvement here is so

25  administrative and perfunctory that it doesn't really

1    matter.  So not only did you have noncompliance, but the

2    Court said it didn't matter.

3           MR. COHEN:  Well, I think the Court in some

4    respects stated what is, in fact, true, which is the STB

5    acts purely in administerial capacity.  It doesn't make any

6    judgment in issuing a NITU.

7                But at the end of the day in a takings case,

8    you can't have a situation where the Act itself -- the

9    mechanics of the Act which preclude abandonment under State

10   law is then used as an argument to preclude a taking under

11   the Fifth Amendment.  It's really -- it becomes circular,

12   and it frustrates the purpose of the Fifth Amendment,

13   because the -- to go back to Justice O'Connor's concurrence

14   in Preseault I, she said, essentially, the only reason that

15   this Act is constitutional is because landowners have an

16   opportunity under the Tucker Act to receive just

17   compensation for their state law property interests that are

18   thwarted by the statute.

19          THE COURT:  As an aside, there's a little Tucker

20   Act.  Does that mean there's a big Tucker Act?

21          MR. COHEN:  Well, nobody calls it the big Tucker

22   Act.  It's just the Tucker Act.

23          THE COURT:  All right.  In any event, finish your

24   vibe.  I just lost my train of thought.

25          MR. COHEN:  Well, Your Honor, I agree that --

1          THE COURT:  Oh, I had it.  Let me come back here.

2     How can it be said -- this gets circular too -- that rail

3     banking is not a use that is consistent with railroad

4     purposes if the very purpose of rail banking is to keep the

5     stretch usable someday so it can be used again by a

6     railroad?

7          MR. COHEN:  I'm sorry; how can it be said that it

8     is?

9          THE COURT:  Your position is that rail banking,

10    one of the two occurrences under the Act, would be

11    inconsistent in this case with utilizing the easement for

12    railroad purposes.  Is that correct?

13         MR. COHEN:  Yes.  Because it's not a present

14    railroad use.  To say that we're going to use the property

15    now for nonrailroad uses, recreational uses, essentially,

16    but because -- and, again, because of the operation of the

17    Federal statute which mandates that it is rail banked, it

18    has to be available for -- to be -- to go back to railroad

19    use.  To say that that's now a railroad use, I think, one,

20    is not factually correct, because it's not a present use of

21    the property for railroad purposes.  And moreover, in terms

22    of a takings analysis under the Fifth Amendment, you're,

23    again, using a mechanism of the statute to defeat the

24    takings claim that's brought to remedy the statute.  If --

25         THE COURT:  Is your argument, at least insofar as

1    a use being inconsistent with a railroad purpose, stronger

2    on interim trail use than it is on rail banking?

3              MR. COHEN:  I think it's a clearer argument,

4    because you're not talking about a -- essentially what I

5    would call a fictitious use or a fictitious purpose, this

6    rail banking, this potential use down the road that's built

7    in the Act, whereas interim trail use is actually a real use

8    that we can actually talk about, we can actually look and

9    see what's going on, we can -- we can look to see whether or

10   not it's consistent with the actual easements that were

11   conveyed by the -- by the grantors.

12             THE COURT:  All right.  I have asked a number of

13   questions.  Now I'm going to turn the floor over to you, and

14   you can finish up telling me anything you want.

15             MR. COHEN:  All right.  Thank you, Your Honor.  I

16   think the Court has explored the issue of abandonment fairly

17   well, so I won't belabor that.

18                  In terms of the -- whether or not interim

19   trail use is consistent with -- or is a railroad purpose,

20   under Pennsylvania law, I think here you need to look at the

21   deeds themselves, look and see what the actual language is.

22   Many of these deeds actually state that the -- or the

23   purpose -- limits the use of the property to purposes of

24   said railroad.  Those are clearly railroad purposes.

25                  I think as the Thaves case said --

1          THE COURT:  Could you have a situation where the

2    railroad did -- I'm answering my own question, but you

3    answered it for me.  Could you have a situation where the

4    railroad, as a matter of Pennsylvania law, did not abandon

5    the line, and, yet, your clients still win on the basis that

6    the new use is inconsistent with the original easements?

7    Could you have that, or would that be a de facto abandonment

8    anyways?  Because the cases seem to mix the concepts up.

9          MR. COHEN:  Yes, they do.  I think it would --

10    well, if --

11          THE COURT:  Let me ask the question this way:  If

12    the railroad as a matter of law did not abandon the

13    right-of-way, is there any way you can win this case?  As a

14    matter of State law, it did not abandon the right-of-way, is

15    there any way you can win this case?

16          MR. COHEN:  I think there is a -- there is a

17    potential argument that the -- that if the use exceeded the

18    scope of the easement granted, that that could -- that would

19    create the additional burden on the land that Justice

20    O'Connor talked about and create a takings claim.

21          THE COURT:  It would be accurate for me to say,

22    though, would it not, based upon my reading of your brief

23    and the brief discussion we've had here this afternoon, that

24    most of your takings eggs are in the abandonment basket?

25          MR. COHEN:  Yes, I think that's fair to say.  That

1    is traditionally how these cases are analyzed.  That there

2    is -- abandonment is generally a prerequisite to the -- to

3    reversionary interests coming into place.

4                However, there are cases under -- under

5    Pennsylvania law where railroad -- where railroads exceed

6    the scope of an easement granted if they are using a -- if

7    the grantor is only granted an easement for railroad

8    purposes and they use it for another purpose --

9                THE COURT:  You cite the Chu case in your papers

10   involving the -- I guess that was a case where a railroad

11   line went from a railroad line to a bus line, I think, if I

12   remember correctly.

13                MR. COHEN:  Yes, it did.

14                THE COURT:  Do you see anything distinguishing

15   between Chu and the situation that brings us here today?  Or

16   do you think it's -- what does Chu -- what does Chu do for

17   you?

18                MR. COHEN:  Well, Chu, in Chu, the railroad

19   condemned a portion -- I think it was the Villanova branch

20   in 1905.  The Court found that it acquired a fee simple -- a

21   feasible in the land that is titled subject to defeat in the

22   event the railroad company abandoned the land as a railroad

23   right-of-way.  And then on the eve of abandonment, or

24   when -- I should say, when the railroad ceased operating the

25   right-of-way as a railroad corridor, and there was

1    proceedings before the PUC, the Commonwealth condemned the

2    property for highway purposes.

3              And the Commonwealth made many of the same

4    arguments that the Government makes here; that the

5    landowners were entitled to no compensation, because they

6    had one -- the original use was for a railroad, now it's

7    being used for buses, so they are not entitled to

8    compensation.

9              The Pennsylvania Supreme Court disagreed.

10   The Pennsylvania Supreme Court said that if the Commonwealth

11   had not condemned the land, Plaintiffs would have acquired

12   fee simple title to it, and it didn't matter that it was

13   being -- that it was being used for another purpose, even

14   another public purpose, because it wasn't the purpose that

15   the railroad had acquired under -- under its condemnation.

16             So I think that case is analogous to this

17   situation, where the Government argues that this corridor

18   should be looked upon as a public highway and its use not

19   limited merely to that of a railroad line, but to any public

20   purpose, any -- I think the Government uses -- makes the

21   argument that this is really another transportation purpose.

22   I would -- I would disagree with that.  I don't think

23   recreation is transportation.  But that's, I believe, the --

24   the import of the Chu case.

25             THE COURT:  I'm not saying you're not right.  I

1    have no fixed opinion on this at all.  And I'm about to chat

2    with the Defendants.

3              But let's move from law to just policy a

4    little bit.  If you're right here -- well, first of all, let

5    me say this:  There's no question that the purposes of the

6    Rails -- the Federal Rails-to-Trails Act, among other

7    things, was to preserve nationwide our railroad lines, such

8    that if at a future point in time it became necessary or

9    prudent to reactivate them -- because the cost would be

10   absolutely prohibitive of trying to go back and do what has

11   been done over the past 150 years.  Would you essentially

12   agree with that?

13             MR. COHEN:  I would agree with that.  And I would

14   also agree that the policy reasons behind the Rail Banking

15   Act are good policies.  But all the Courts have said that

16   the --

17             THE COURT:  And the other thing I left out -- and

18   I'll let you finish your point.  Not only that, but, also,

19   so these -- these railroad lines don't lay fallow, it seems

20   to me that the other purpose was a public purpose, and that

21   was to open up large tracts of land to the public for their

22   use and enjoyment until such time as the railroads might

23   come back.

24             MR. COHEN:  I agree with that also, Your Honor.

25   But I think that -- and, again, the Courts have reiterated

1    this -- the value of the public purpose is -- should not be

2    a part of the --

3             THE COURT:  Equation.

4             MR. COHEN:  -- the equation.  Congress has the

5    right, through the commerce clause, to do this.

6             THE COURT:  Right.

7             MR. COHEN:  What we're talking about here is

8    whether or not --

9             THE COURT:  There's a taking.

10            MR. COHEN:  -- there's a taking, and whether or

11   not the Fifth Amendment takings clause has any real meaning

12   in the context of rail banking.

13                 Because I think if you go down the road where

14   the Court has been going, it will essentially -- just by

15   virtue of the Act itself, no landowner, no matter what his

16   title is under State law, could ever prove a taking.

17   Because if rail banking is a railroad purpose, then --

18            THE COURT:  Of course, it depends entirely, does

19   it not, on the vagaries of each State law?  Does it not?

20            MR. COHEN:  Sure.

21            THE COURT:  To a large extent.

22            MR. COHEN:  Ultimately it does.  However, again --

23            THE COURT:  Of course, you're right.  If you take

24   one path, then under no circumstances, arguably, could you

25   ever find a situation where there has been a reversion or an

```
 1   abandonment sufficient to constitute a taking.

 2                 On the other hand, if you take the other

 3   path, it would almost cause the whole system to collapse,

 4   because you'd almost never -- I'm going to use -- almost use

 5   a double negative.  You would always find a situation,

 6   practically, where there had been a taking.  Isn't that

 7   right?  Aren't there two extremes here?

 8              MR. COHEN:  Well, I disagree with that statement

 9   to the extent that in many instances, the railroad owns most

10   of the corridor in fee.  I mean, there's many instances

11   where this is not an issue, because the railroad has fee

12   simple title to the corridor.

13                 The only time you even have this issue is

14   when the railroad only obtained less than fee simple.

15              THE COURT:  When does your statute of

16   limitations -- assuming that the Federal Circuit law is the

17   law, when does your statute run in this case?

18              MR. COHEN:  It began, I believe, in October --

19              THE COURT:  2003.

20              MR. COHEN:  So 2009.  Two years.

21              THE COURT:  All right.  We're going to take a

22   short break.  I'm going to hear from the other side.

23              MR. COHEN:  Thank you, Your Honor.

24              (Recess held from 2:20 p.m. till 2:26 p.m.)

25              MS. TARDIFF:  Thank you, Your Honor.  May it
```

 1   please the Court.

 2           I set aside my notes here because I think

 3   maybe the best place to start is by kind of going through

 4   some of the issues you discussed with Plaintiff's counsel

 5   and addressing those.  And I think where I'd like to start,

 6   what might be the most helpful it to kind of talk about the

 7   dynamics between--

 8           (Ms. Tardiff asked for clarification by the

 9            reporter.)

10           MS. TARDIFF:  To speak a little bit about the

11   relationship between the inquiry as the Government has

12   framed it as kind of a scope of the right-of-way, scope of

13   the easement question, and whether --

14           THE COURT:  I apologize.  You are here for who?

15           MS. TARDIFF:  For the United States.

16           THE COURT:  Oh, you're here for the United States.

17           MS. TARDIFF:  Yes.  Unless you wanted to hear

18   from --

19           THE COURT:  No, that's fine.  I just need to know

20   who is talking to me.

21           MS. TARDIFF:  Okay.  Sorry.  Yes, Your Honor, Kris

22   Tardiff for the United States.

23           So, again, I think one of the best places to

24   start would be to talk a little bit about the relationship

25   between the two inquiries as the parties have framed them.

1   And we have, on one hand, the scope of the easement, the

2   scope of the right-of-way inquiry and whether the uses

3   authorized by the Trails Act are permissible uses of the

4   right-of-way under that inquiry, versus the question of

5   abandonment and whether the railroad's actions, including

6   those present uses, as authorized, are -- constitute

7   abandonment or demonstrate intent to abandon --

8          THE COURT:  I think that's fair.  But before we

9   even do that --

10          MS. TARDIFF:  Sure.

11          THE COURT:  -- let's talk about the ripeness

12   question here.

13          MS. TARDIFF:  Okay.

14          THE COURT:  That bothers me greatly in this case.

15   Because we have a case where the -- the final chapter in the

16   rail banking saga has not been written, and it could be.  I

17   don't know what the future holds.

18          But, you know, the strange thing about this,

19   come April 5th or 6th, or whenever their next extension is

20   up, what happens if A & E says, you know what, we're out of

21   here; we abandon this thing?  All this is sound and fury

22   signifying absolutely nothing, isn't it?

23          MS. TARDIFF:  That's a fair concern, Your Honor.

24   And one of the reasons we proceeded this far -- and I think

25   this is true for both the parties -- is that we are bound,

1    to some extent, by what the Federal Circuit has ruled in

2    terms of claim accrual.  And they have said quite clearly in

3    Caldwell and then Barclay, which is the decision that

4    followed the Caldwell decision, that these claims -- takings

5    claims brought under the Trails Act accrue at the time this

6    notice of interim trail use or NITU is issued by the Surface

7    Transportation Board.  That that is the start -- at least

8    that triggers the statute of limitations.

9              Now, there are cases -- and this is one of

10   them -- where a claim can accrue for statute of limitation

11   purposes, and, yet, there are activities that are still

12   going on that may affect the nature of the claim.

13             THE COURT:  If you know, how have Courts, where

14   that situation exists, like it does here, how have they

15   handled that on this issue?

16             MS. TARDIFF:  In the Rails-to-Trails takings

17   context, this is the first case we've had with this fact

18   pattern.  And to be perfectly honest, Your Honor, we

19   struggled with how --

20             THE COURT:  Because there's a contingency here --

21             MS. TARDIFF:  Yes.

22             THE COURT:  Let me be just very blunt about it.  I

23   have a question as to whether I have jurisdiction; whether

24   this is a -- in the sense of whether there is a justiciable

25   controversy, because there is a potentiality in the future

1    that could render this whole thing completely moot.

2            MS. TARDIFF:  We think that the Court does have

3    jurisdiction.  And this stems, in part, from the Federal

4    Circuit's decision in Caldwell and Barclay that say these

5    claims are right, Plaintiffs have the right to bring them,

6    even though there are events transpiring that may better

7    define what those claims are.

8            THE COURT:  But in Caldwell, did Caldwell envision

9    the situation where -- well, in Caldwell, had the Trail Act

10   run its course, such that there -- I mean, were they at a

11   different place than we are procedurally?

12           MS. TARDIFF:  Procedurally, yes.  Although the

13   focus of the Caldwell decision was statute of limitations.

14   But in Caldwell, there had been a rail banking interim trail

15   use agreement negotiated by the parties.

16           THE COURT:  Did you consider filing a Motion to

17   Dismiss based in part upon Article III issues here?

18           MS. TARDIFF:  We did not, because we believe that

19   that would be inconsistent with what the Federal Circuit has

20   told us in Caldwell regarding claim accrual.

21               Now, what we did consider at one point is

22   whether we ought to stay these proceedings for a period of

23   time.

24           THE COURT:  Well, that's my next question.

25           MS. TARDIFF:  Yes.  Until we know what is going to

1    happen.  And that may still be the right choice here,

2    because I understand --

3          THE COURT:  Because you could end with a purely

4    advisory opinion that means nothing.

5          MS. TARDIFF:  And we don't want to ask the Court

6    to spend time doing that, and that doesn't serve the

7    parties' interests either.

8                One of the reasons we did decide to move

9    forward instead of staying -- and we're certainly open to

10   discussing a stay and would not be opposed to one under the

11   circumstances, particularly in light of the issues that have

12   been raised.  One of the reasons we moved forward and

13   briefed this on a Preseault-type case on the assumption that

14   there will be a rail banking interim trail use agreement

15   reached --

16         THE COURT:  Is it likely -- I mean, if anybody

17   knows -- it strikes me -- and I don't know what the

18   statistics are.  But I think it is the exception rather than

19   the rule that an agreement isn't reached in these cases.  Is

20   it likely that there will be some agreement reached someday

21   in this case?

22         MS. TARDIFF:  I spoke with both the railroad's

23   counsel and the attorney for the County that's kind of

24   taking the lead here in the trail group, and -- just on

25   Tuesday of this week, before I headed down here, and my

1    understanding from my conversations with them, which is

2    consistent with conversations I had with them back when we

3    started briefing, is that an agreement is imminent --

4            THE COURT:  And I know it's not part of the

5    record, and --

6            MS. TARDIFF:  No, it's not.

7            THE COURT:  -- certainly Mr. Cohen can chime in.

8    This is just for background.  But what, for goodness sakes,

9    has taken them so long?  I mean, we're not negotiating the

10   Louisiana Purchase here.  This is just a short strip of

11   land.  What is going on here?

12           MS. TARDIFF:  I don't know the details of what's

13   transpired over the last couple of years, because the United

14   States is not a party to that transaction.  The

15   Transportation Board is not.

16           THE COURT:  I understand.

17           MS. TARDIFF:  But my understanding, from talking

18   to the County's attorneys and the railroad's attorneys, is

19   that they have an agreement framed out or a basic agreement

20   on all the terms.  The counties are doing some due diligence

21   with respect to title issues; making sure there are no

22   environmental issues on the corridor that would be of

23   concern to them.  The railroad, for its part, is conducting

24   an appraisal of the corridor.

25               It is the railroad's intent, at this time

1  anyways, to donate the line to the counties or the trail

2  group.  And so as part of its --

3      THE COURT:  One or the other?

4      MS. TARDIFF:  To -- probably to the trail group,

5  although I don't know that detail.  I think since we had

6  this West Creek Trail Association that has stepped in as a

7  sponsor --

8      THE COURT:  But whether it would be -- and, once

9  again, this is outside the record.  But is it your

10 understanding that whether it would be the County or the

11 trail group, even if it was the County, it would still, in

12 part, be used for trail purposes?

13     MS. TARDIFF:  That's my understanding.  Again,

14 although that could take, you know, years to come.

15     THE COURT:  All right.  Well, we'll talk about

16 stay and other issues later, and I'll let Mr. Cohen weigh in

17 on that.

18         Now let's go to the merits on this thing.

19     MS. TARDIFF:  Absolutely.  And I don't think at

20 this point -- we certainly wouldn't be opposed to a stay to

21 allow this to develop, particularly when it doesn't appear

22 that it's going to be that much longer before we'll know

23 which direction the regulatory proceedings are going.

24         So let me get back to the merits and kind of

25 a comparison to the scope of the easement inquiry and then

1   abandonment on the other side.  And I have put a lot of

2   thought into this as well, because the parties have

3   approached this a little differently.

4            But I think when we read cases like Buffalo

5   Township and then look at cases that have come out of the

6   Federal Circuit, whether it's Thaves on one end of the

7   spectrum, Chevy Chase on the other end, that the scope of

8   the easement inquiry is really almost one side of the coin,

9   and abandonment is the other side of the coin.

10           And let me explain that.  If the railroad --

11   or if the Court approaches the scope of the easement

12   question first or scope of the right-of-way and asks whether

13   the present uses, as authorized, rail banking and/or interim

14   trail use, are permissible uses of this right-of-way, then

15   that is really the end of the inquiry.  You don't -- if

16   those uses are permissible, then it follows that those uses

17   cannot be -- would not support a finding of intent to

18   abandon or actual abandonment.

19         THE COURT:  Because they would be consistent with

20   the original use.

21         MS. TARDIFF:  Correct.  So they couldn't be --

22   they wouldn't demonstrate an intent to permanently abandon

23   the right-of-way.

24         THE COURT:  On the other hand, but the flip side

25   could go this way:  If those -- if those uses were

1    inconsistent with the original use, even if the railroad did

2    not intend to permanently abandon, there could still be a

3    reversion.

4         MS. TARDIFF:  If the uses were found to be

5    inconsistent with the right-of-way --

6         THE COURT:  Yes.

7         MS. TARDIFF:  -- then -- well, from the

8    perspective of this case --

9         THE COURT:  Because the property would be burdened

10   in a way that it was not originally contemplated.  That's

11   the way to put it.

12        MS. TARDIFF:  Yes.  And if the Court then further

13   found that there was no shifting public-use-type doctrine

14   available under Pennsylvania law that would allow that

15   change in public use, you have to take that step as well.

16        THE COURT:  Right.  Then the abandonment would be

17   irrelevant.  So they are slightly distinct, aren't they?

18        MS. TARDIFF:  They are slightly distinct.

19        THE COURT:  And, by the way, I have to tell you,

20   both sides here, that I have not heard the term "fee simple

21   absolute" or "determinable" since my first year of law

22   school, so this has been quite an experience.

23        MS. TARDIFF:  I have commented to some colleagues

24   of mine who actually teach property law that, really, what

25   they need to do is take one of these cases, and they could

1    teach an entire first-year property law, based on what --

2           THE COURT:  I wished I had paid better attention

3    in my first-year property law.

4           MS. TARDIFF:  I think we all had to re-learn a few

5    of these terms as we proceeded.

6           THE COURT:  Go ahead.

7           MS. TARDIFF:  So, anyway, as I just discussed, in

8    a case such as this, we believe it's appropriate for the

9    Court to kind of begin with the scope of the easement, scope

10   of the right-of-way inquiry, and it may be that you just

11   don't even get to the question of abandonment at all.

12          THE COURT:  How do I approach that issue?

13          MS. TARDIFF:  On the scope of the easement or

14   scope of the right-of-way -- and I use both terms, and maybe

15   we can say just easement.  But by using easement --

16          THE COURT:  Let's just say right-of-way, and I

17   will assume that the easement is subsumed within that term.

18          MS. TARDIFF:  It is.  And I just want to clarify

19   that even when the term "easement" comes into play here,

20   we're not talking about a common law easement.  We have

21   cited some cases here.  But railroad easements, even when

22   they are called easements, are a different creature.

23          THE COURT:  Walk me through the analytical process

24   that I would go through in resolving that issue.

25          MS. TARDIFF:  I think we agree with the Plaintiffs

1   that the starting point for that -- for this inquiry, the

2   scope of the right-of-way inquiry, is to look back at the

3   original conveyance documents to the railroad.

4           THE COURT:  And what would that -- when I do that,

5   what do you believe that will show me?

6           MS. TARDIFF:  In this particular case, we believe

7   the Plaintiffs have interpreted the conveyance documents

8   here -- and we have a number of them.  They are all in the

9   record.  We have a number of deeds.  There are also some

10  condemnation awards in play here.

11              The parties have stipulated that these were

12  conveyances of a right-of-way for railroad purposes.

13  Plaintiffs take that and say, well, railroad purposes, that

14  means they can run trains on it, but they can't do anything

15  else.  Our --

16          THE COURT:  Well, some of the deeds, if I go

17  look -- putting aside the condemnation deeds.

18          MS. TARDIFF:  Um-hum.

19          THE COURT:  But are some of the deeds, if I read

20  them, going to be much more, by their language, restrictive

21  in what arguably could be done in the future than others?

22          MS. TARDIFF:  In this particular case, Your Honor,

23  I don't think any of the deeds that we are presented with

24  are restrictive at all.  They make reference to the fact

25  that it's intended that this right-of-way would be used for

1    railroad purposes.  But, you know, that's obvious from the

2    fact that it was a conveyance to a railroad that had

3    authority to build rail lines.

4            THE COURT:  Are all of -- aside -- tell me if I

5    got the major categories here.  I and V and part of IV are

6    fee simple.  Is that right?

7            MS. TARDIFF:  I think that's correct, Your Honor.

8            THE COURT:  And then there's something that has

9    been referred to as a conditional fee in II.

10           MS. TARDIFF:  Correct.  A fee simple determinable.

11   But that's a conditional fee.

12           THE COURT:  For my purposes in analyzing what was

13   granted at the time, is there a difference between a fee

14   simple determinable and an easement for railroad purposes?

15           MS. TARDIFF:  For the purposes of this case, under

16   Pennsylvania law, we don't believe that there is a

17   difference, a meaningful difference between those two.  That

18   might be different in some states, but under Pennsylvania

19   law, whether we're dealing with a fee simple determinable

20   that has a right of reverter or the conveyance of just a

21   right-of-way, where there is also a reversionary interest,

22   which is really the same thing --

23           THE COURT:  Is the only difference, as you see it,

24   that in some of the deeds, it was specifically spelled out

25   for railroad purposes, and in the fee simple determinable,

1    there would be a right of reverter, but there would be no

2    specific description as to the purpose, but it would be

3    implied because it was a railroad?

4         MS. TARDIFF:  I think that's correct.  And we do

5    have one deed that has more of a description.  I think we

6    have described it in our reply brief.  I want to say it's a

7    Category II deed that gives a fairly broad description of

8    the type of uses that are contemplated in terms of railroad

9    uses.  But it's not limiting language.  It's --

10        THE COURT:  What about the warranty deed?  Is

11   there a warranty deed or deeds?  And what are they?

12        MS. TARDIFF:  We have warranty deeds that the

13   parties have stipulated conveyed fee simple interests to the

14   railroad, so those are the group that the parties agree

15   there is no reversionary interest.

16        THE COURT:  All right.  Is it the position of the

17   United States, then, in sum, that with respect to any of the

18   deeds that remain in play here, which is any of them other

19   than the fee simple absolute deeds and -- the other deeds

20   and the land that was condemned, that the same analysis that

21   all of those, either explicitly or by implication, are

22   essentially easements for railroad purposes?  Is that your

23   position?

24        MS. TARDIFF:  The parties are in agreement on

25   that.  I think the distinction between the parties' position

1    here is whether the reference to railroad purposes, where

2    there is such a reference, whether that is intended to be

3    limited language or whether it's just a description of the

4    use that everyone knew that this would be -- the

5    right-of-way would be put.

6              So that's an important difference.  And

7    Plaintiffs have just assumed in their argument that railroad

8    purposes and the reference in the deeds is limiting, you

9    know, by its terms, and that's not correct.  And I think --

10         THE COURT:  Why isn't -- why -- how do I go back

11   with -- how do I go back to 1886, for instance, and get into

12   the mind of the grantor and grantee and define what they may

13   have thought was a railroad purpose, if the deed doesn't

14   spell it out?

15         MS. TARDIFF:  That's a very fair question, and the

16   answer is if it's not clear on the face of the deed -- and

17   it isn't here.  There's just simple references to railroad

18   purposes, with the one exception I mentioned, which gives a

19   rather long laundry list of possible uses.  At that point I

20   think what we have to do is go back and look at the

21   authorizing legislation, because the railroad in question

22   here, as any railroad that was constructed in Pennsylvania,

23   had to have authorizing legislation basically incorporating

24   the railroad as a matter of Pennsylvania law.  Those

25   authorizing statutes spell out what rights the railroad had

1    in its construction of right-of-ways and rail lines within

2    the Commonwealth.

3                And when we look back at those authorizing

4    legislations -- and there's, I think, an 1847 and an 1849

5    Act in the record that we have cited to you in particular --

6    it's quite clear that the railroads were given very broad

7    authority, including condemnation authority, which ties back

8    to kind of the public nature of these rights-of-ways in the

9    first instance.

10           THE COURT:  Well, what does the authorizing

11   legislation which permitted railroads in the first instance

12   to get up and running in Pennsylvania, what does that

13   tell -- what should that tell me or can it tell me on the

14   question of the scope of the easement?

15           MS. TARDIFF:  What it tells us is that the

16   railroads were authorized to go out and acquire

17   rights-of-way for the purposes of constructing, maintaining,

18   and running their -- their railroads.

19                There's references in -- I think it's the

20   1847 Act, Section I, in particular, to, you know, making use

21   of these lands for transportation purposes.  There's further

22   reference in those authorizing statutes about transportation

23   of passengers, transportation of freight.  And then, again,

24   references throughout about the public nature of these

25   rights-of-way.

1          THE COURT:  But one would think, wouldn't you,

2     that -- and this is why it gets so difficult, if the

3     exercise is to define the intent of the original parties.  I

4     mean, it would not be a stretch, would it, if, for instance,

5     some of this land -- and I'm not saying it was.  But to pick

6     a date, 1875, some of this -- we have a -- we have a

7     conveyance and easement for railroad purposes.

8               Do you think it was the slightest flicker in

9     either of those parties' minds that someday on the stretch

10    that they had just conveyed, rather than having an old

11    railroad train belching smoke, running up and down it, that

12    you would have 10,000 people on motor bikes or on -- riding

13    surreys, or those covered things, or bicycles or God knows

14    what -- recreational use -- could that have been

15    contemplated at the time?

16          MS. TARDIFF:  At that point in time I think trail

17    use, as we know it today, probably was not contemplated.  It

18    wasn't -- it just wasn't within the realm of what people

19    thought about in terms of transportation.

20               But that doesn't mean that the present uses

21    authorized by the Trails Act are not permissible.  I mean, a

22    right-of-way is the right of passage across land, and --

23          THE COURT:  Do you need the shifting public use

24    doctrine in order to transform rail banking and interim

25    trail use into -- to create the fiction that those uses do

1    not necessarily tread upon the original uses contemplated by

2    the easement?

3            MS. TARDIFF:  Absolutely not.  And let me explain

4    that.  Rail banking and interim trail use are two distinct,

5    present uses of the corridor that are authorized under

6    Federal law.  Rail banking, as a separate use, is a

7    preservation of these corridors so that they are available

8    for future active rail use.

9            In that respect, rail banking is really the

10   Federal law equivalent of mere nonuse of a right-of-way for

11   a period of time, which has always been permissible under

12   State law.  We just have a Federal mechanism in place for

13   it.

14           THE COURT:  What about the interim trail use?

15           MS. TARDIFF:  Interim trail use --

16           THE COURT:  That's a harder argument to make,

17   isn't it?

18           MS. TARDIFF:  I will concede it's a little hard,

19   but nonetheless we think that interim trail use still --

20           THE COURT:  And I'll tell you why.  Because --

21   because if the only purpose here was to preserve a line for

22   the future enjoyment of the grantee, the railroad, you could

23   accomplish that perfectly by simply rail banking and doing

24   absolutely nothing else, couldn't you?

25           MS. TARDIFF:  Well, that's true.  And prior --

1          THE COURT:  I mean, end of story.  You have

2    preserved the bed.  They still have the right to go back in,

3    but you don't have hypothetically hundreds of thousands of

4    people moving up and down the property every summer.

5          MS. TARDIFF:  And one of the reasons -- and let me

6    step back.  Under Federal regulatory law with respect to

7    railroads, there has -- there was a mechanism in place for

8    rail banking before the current version of the Trails Act

9    that we're dealing with in this case, and that's called a

10   discontinuance.

11         THE COURT:  Right.

12         MS. TARDIFF:  And so railroads have always had the

13   option of discontinuing their present use of a right-of-way

14   while still maintaining ownership, control, and full

15   financial responsibility.

16             And what Congress found is that that

17   additional burden of having financial and management

18   responsibilities for these corridors during a period of

19   nonactive rail use was cost-prohibitive for a lot of

20   railroads, and that railroads were not using that as an

21   option.  Because bear in mind that this is voluntary.

22         THE COURT:  So you needed another caretaker to

23   come in and maintain the premises, if you will, during the

24   railroad's absence.

25         MS. TARDIFF:  Correct.  There's benefits to the

1   railroad, certainly to the trail group, and, frankly, to

2   abutting landowners to have an active presence managing and

3   financially responsible for the corridor during a period of

4   nonactive --

5          THE COURT:  Now, all that said, from whence

6   springs your contention that interim trail use does not

7   represent a new use or an old -- a new burden on the

8   easement that would not have reasonably been contemplated at

9   the time of the original deeds?

10         MS. TARDIFF:  Well, it stems back to the need to

11  define what the scope of this right-of-way is in the first

12  instance and whether it is strictly limited to the active

13  running of trains or whether it is a broader --

14         THE COURT:  All right.

15         MS. TARDIFF:  -- right-of-way easement.

16         THE COURT:  That's the question.  But where do I

17  go to find the answer?

18         MS. TARDIFF:  Again, I think we go back to -- we

19  start with the deeds at issue here, or the condemnation

20  awards --

21         THE COURT:  They won't tell me anything about

22  interim trail use.

23         MS. TARDIFF:  They won't tell you anything, but

24  they also don't have limiting language that restricts the

25  manner in which the railroad is using the corridor.  The

1    railroad has broad discretion in terms of determining what

2    uses serve and further railroad purposes in this case.

3                    And, here, we have clear indication that the

4    railroad --

5                    THE COURT:  Could a railroad -- and I don't

6    mean -- sometimes to test the principle, you need to go a

7    little to the absurd.  Could a railroad, rather than -- as

8    part of an NITU -- of course, I suppose it would still have

9    to be approved.  But if a railroad was to convey its

10   property to an amusement park, such that you had a Ferris

11   wheel and that type of thing, would that -- if their

12   discretion is broad, where does it end?

13                   MS. TARDIFF:  Well, I think there are -- there are

14   a couple of limitations.  First of all, any interim use that

15   is made of the right-of-way during the rail banking period

16   needs to be consistent with rail banking.  The trail sponsor

17   or the entity responsible for the corridor cannot put the

18   corridor to a use that is going to interfere with or

19   preclude the restoration of rail service.  So --

20                   THE COURT:  All right.  So you couldn't have a use

21   where it would render it infeasible for the railroad to come

22   back.

23                   But that having been said, I'm still looking

24   for a common touchstone here.  And would it be that in terms

25   of describing the breadth of the railroad's discretion --

1    and is it your position that the railroad could convey the

2    property to any entity, so long as it involved the movement,

3    either vehicular, recreational, or on foot, of movement of

4    people?

5            MS. TARDIFF:  As long as --

6            THE COURT:  Because, otherwise, the -- the

7    discretion of the railroad cannot be unbounded.  There has

8    to be some bound to it.

9                I'm trying to decide what the benchmarks

10   would be to decide whether there has been -- whether they

11   have exceeded their legitimate discretion.

12           MS. TARDIFF:  I think there are a couple of bounds

13   that the parties and the Court need to be mindful of.

14               Number one, whether it's the railroad or

15   someone in charge of interim trail use for a period of time

16   in using the corridor, the use has to be a public one and,

17   really, a transportation one.  You know, a movement --

18   passage of people across land.

19           THE COURT:  Would any use -- would any use that is

20   a public use, as long as it is not inconsistent with the

21   eventual reuse of the railroad line, be acceptable?

22           MS. TARDIFF:  The Federal law specifically refers

23   to interim trail use, so I think that is the use that is

24   authorized by Federal law.  I think it's conceivable

25   under -- as a matter of Pennsylvania State law that a

1    railroad could come in, and as long as -- and, say, build a

2    road that's used for cars.  And I think as long as that's --

3    as long as it remains a public use, a transportation use,

4    that that's probably authorized as a matter of State law.

5              But, again, here, as a matter of Federal

6    law -- and when we talk about liability here, I need to

7    emphasize that the National Federal rail banking law, the

8    focus and the authorized use is interim trail use.

9         THE COURT:  Are you saying that interim trail use

10   may reasonably be construed as one of the appropriate uses

11   that would have been subsumed within the original easements

12   on the theory that interim trail use is just another

13   mechanism of preserving the rail banking?

14        MS. TARDIFF:  I think that's accurate.  It is.

15   It's a mechanism.  It furthers the rail banking purpose by

16   essentially encouraging railroads to voluntarily rail-bank

17   their corridors because there's somebody coming in and

18   taking responsibility --

19        THE COURT:  But what if I find that interim trail

20   use is a new use?  In other words, is a use that was not

21   originally subsumed within the original easements.  Is that

22   when your public use doctrine shifts in?

23        MS. TARDIFF:  That would -- well, there's two

24   parts of the inquiry.  The Court would still need to address

25   rail banking as an independent --

1          THE COURT:  Well, let's put rail banking aside.

2          MS. TARDIFF:  If we put that aside and are just

3     looking at interim trail use, and the Court finds that,

4     okay, rail banking is okay, but interim trail use, well,

5     that's another layer here, and that exceeds the use, at that

6     point, yes, then I think we kick over to the concept of

7     shifting public uses.  And, again, then have to go back and

8     look, perhaps, at the authorizing legislation and

9     Pennsylvania's Rails-to-Trails Act, quite frankly, because

10    that is certainly an indication from the Pennsylvania

11    legislature that they do view trail use of these corridors

12    as serving a public transportation purpose as part of a

13    multi-modal transportation system.

14         THE COURT:  So, first of all, are you aware of

15    any -- interestingly enough, when you look around the

16    country in other states, there are very few state decisions

17    that actually use the term "shifting public use".  I mean,

18    the concept is out there, but I would have thought --

19    there's none in Pennsylvania that I have been able to find.

20         MS. TARDIFF:  We didn't find any that actually use

21    that term.  And we employed the term in our brief just

22    because that's kind of a modern label that's been applied to

23    a concept that's been around for generations.

24         THE COURT:  And the concept is this:  Tell me if

25    this is right.  That certain types of property are

1    inherently viewed with a latent potentiality for public use

2    or enjoyment, such that if they move from one type of use to

3    that type of use, there has been no taking.

4         MS. TARDIFF:  I think that's an accurate summary

5    of what the doctrine is, correct.

6         THE COURT:  Well, what is your take -- I've heard

7    Mr. Cohen's take.  What is your take on Buffalo II?

8         MS. TARDIFF:  Well, I think Buffalo II is -- well,

9    certainly on the abandonment question, I think it's

10   dispositive here.  I think in Buffalo II, the Court looked

11   at what the railroad had done in terms of participating in

12   the regulatory process, quitclaiming its interests to a

13   salvage company, then pulled up all the rails and ties, and

14   then the salvage company, in turn, quitclaims it to the

15   Township for trail purposes, with the railroad retaining a

16   right of reentry.  So it's very similar to what we have

17   here.

18         And I think there, under the theory of

19   abandonment, the Court said, well, those actions don't

20   constitute abandonment, because they are consistent with the

21   right-of-way.

22         THE COURT:  But like we said a minute ago, though,

23   you could theoretically -- theoretically -- and I just say

24   theoretically because I have no fixed opinion on it.  Even

25   if you're right under Buffalo II, that there's been no

1    abandonment here, that's not the end of the inquiry, is it?

2         MS. TARDIFF:  Well, if you flip, then, to the

3    scope of the easement, no, it's not the end of the inquiry.

4    But I think conceptually if the actions taken -- and let's

5    look at Buffalo Township.  If those actions don't constitute

6    abandonment, they don't demonstrate attempt to abandonment,

7    they don't demonstrate actual permanent abandonment of the

8    right-of-way, I think at the same time those actions are

9    viewed as within the right-of-way.

10        THE COURT:  Are you saying that as a matter of

11   law, someone would be deemed to have abandoned their

12   entitlement to an easement, even though they had no present

13   intention or permanent intention to do so, if their conduct

14   or activities on the easement were inconsistent with those

15   that had originally been granted?  Is that what you're

16   saying?

17        MS. TARDIFF:  It wouldn't be abandonment in that

18   interest, but --

19        THE COURT:  It wouldn't be.  It seems to me that

20   it would work a -- at that point in time, the land would be

21   burdened in a way that it had not heretofore been, and there

22   would be a taking at that point and perhaps a reversion.  Is

23   that right?

24        MS. TARDIFF:  Well, assuming the Court found that

25   there was some additional burden that exceeded the scope of

 1   the original easement, then yes.

 2         THE COURT:  Don't you -- isn't your position to a

 3   large extent on this interim trail use -- aren't you in a

 4   much better position on that argument if I were to conclude

 5   that interim trail use is authorized under this shifting

 6   public use doctrine than if I were to conclude that it's

 7   not?

 8         MS. TARDIFF:  In terms of not reaching shifting

 9   public uses, or --

10         THE COURT:  Putting aside rail banking -- because

11   I can see there may be material differences between rail

12   banking here and trail use.  But on the limited issue of

13   whether or not interim trail use represents a new burden on

14   the easement, don't -- isn't your position largely dependent

15   upon my finding that that type of use is authorized under a

16   Pennsylvania version of the shifting public use doctrine?

17         MS. TARDIFF:  Not entirely.  I think that our

18   reliance on the shifting public use doctrine or any other

19   label you want to attach to that concept is really a

20   secondary argument.

21               I think in the first instance, it's the

22   Government's position that interim trail use is either a

23   railroad purpose or serves a railroad purpose, or,

24   alternatively, it's a transportation purpose.  And under

25   either of those two scenarios, it is within the scope of

1    this right-of-way as it was originally created.

2                    And, again, to support that, I would refer

3    the Court back to the original authorizing legislation for

4    the railroads, which makes reference both to transportation

5    uses and gives the railroads broad ability to determine what

6    uses it's going to make of that right-of-way to further its

7    railroad uses.

8                    And, here, where there is a rail banking

9    mechanism in place, you have a railroad that has said, well,

10   okay, rather than abandoning this outright, so that it's not

11   available to us in the future, we are going to participate

12   in this rail banking process, and interim trail use is a

13   layer of that, that furthers that rail banking and helps us

14   preserve it.

15             THE COURT:  Does Buffalo Township give me any

16   guidance on the question of shifting public use?

17             MS. TARDIFF:  I -- not in so many words, but -- I

18   mean, it doesn't use that phrase.  But I think by pointing

19   to the State Trails Act there and saying that Trails Act

20   is -- or trail use is an appropriate use of a corridor, we

21   have the Pennsylvania Supreme Court saying that trail use is

22   a -- whether you call it a railroad use or a transportation

23   use, it is a legitimate use of a railroad right-of-way that

24   is a -- that is a public right-of-way in this Commonwealth.

25             THE COURT:  Now, I'm not sure it's a particularly

1  useful way to look at it.  I'm not sure that it's not.  But

2  the Preseault Court, I think, when it was analyzing this

3  question of additional burden, in terms of interim trail

4  use -- and I'm paraphrasing.  But I think the upshot was

5  there's a world of difference between a train running down

6  your track a couple times a day and thousands of people

7  rolling through your back meadow on bicycles and heaven

8  knows what.

9           Can't you envision in the extreme case a

10  distinct change in the character of use between the

11  occasional train going down the track and a very popular

12  trail that might run through some of the most scenic country

13  in the United States?

14           MS. TARDIFF:  I think it gets us back to whether

15  that trail use, you know, serves or fulfills the original

16  purposes of the right-of-way, which is, you know, the

17  movement of people and originally perhaps freight as well.

18           And I think talking about Preseault -- and

19  then Plaintiffs rely heavily on the Thaves case, which is

20  out of the Federal Circuit as well -- I think the thing

21  you -- the point, I think, we would leave Your Honor with is

22  that what we have out of the Federal Circuit is really a

23  spectrum of decisions.  On one hand, you have Thaves and

24  Preseault --

25           THE COURT:  There's not a lot of case law on this

 1  around the country, is there?

 2          MS. TARDIFF:  There is not.  There is not.  And --

 3          THE COURT:  Why is that?  Is this property

 4  movement something that's only -- when I say "property

 5  movement", I'm talking about -- I guess not much could

 6  happen before Preseault, the United States Supreme Court,

 7  which opened the door on the thing, I suppose --

 8          MS. TARDIFF:  I think that certainly was a trigger

 9  point for a lot of these claims.  I think prior to that,

10  there was probably rail banking going on and just no

11  litigation as a result.

12          But we have a limited body of cases, but,

13  again, stepping back and kind of looking at the spectrum we

14  have, you have Preseault, which was a very fragmented

15  decision, and the Federal Circuit really struggled there.

16  And, frankly, had there been a mechanism for certifying the

17  State law, questions there to the Vermont Supreme Court,

18  they would have done so.  There was no mechanism in place at

19  that time.  This is now, unfortunately, but that didn't help

20  us.

21          In Thaves, you had the Federal Circuit,

22  again, applying California law and doing it themselves,

23  rather than certifying.

24          On the other end of the spectrum, one of the

25  cases we cited to the Court is the Chevy Chase decision,

1    also out of the Federal Circuit.  But in that instance, the

2    Federal Circuit said, you know, Maryland law is not entirely

3    clear on these issues.  We're going to certify it to the

4    Maryland Court of Appeals, which is their Supreme Court, and

5    get their answer.  And in that case, the Maryland high Court

6    came back and said, okay, yeah, we have an easement here,

7    but, you know, this is a general right-of-way easement.

8    There is no limiting language in the deeds.  It is perfectly

9    appropriate for the railroad to rail-bank this corridor.

10   Trail use is a permissible use.  These are all public uses.

11           And trail use is, really, the transportation

12   of people.  The fact that some people view it as recreation

13   and others view it as transportation is not a triggering

14   issue.  And I submit that that's always been the case.  My

15   grandparents used to take a train from Wooster,

16   Massachusetts up into the White Mountains of New Hampshire

17   to spend the weekend, when train -- and it was recreation.

18   They were just using it as a means to get there.  When that

19   train service ended, they started driving their car up to

20   the White Mountains for their weekends.

21           THE COURT:  Now you can bike up on the same trail.

22   Let me hear what the amicus has to say.

23           MS. TARDIFF:  Okay.  Very good.  Thank you.

24           MR. SEMINS:  Your Honor, I'm Bill Semins, local

25   counsel for amicus Rails-to-Trails.

1          THE COURT:  Before you start there, let me just

2      say, you raise an issue that had not been raised by the

3      United States in this case, and that is whether or not

4      whatever occurred is sufficient to constitute a taking.  I

5      think it was the last issued raised.  And you did roll over

6      some of the same ground.

7                    In all likelihood, I'm going to give you an

8      opportunity to respond to that, if you want, by way of a

9      short reply brief, although I have to tell you, given all

10     the other issues in this case, and in my general desire to

11     decide cases on the narrowest statutory or constitutional

12     basis, that it would be unlikely that I would wade into

13     that, because I don't have to.

14                    But that having been said, let's start with

15     the argument that wasn't raised by the United States.

16          MR. SEMINS:  Basically, to put that argument in

17     its proper context -- and I think you understand the

18     framework, based on the presentation today and the questions

19     that you asked -- is that you've got the three hurdles as we

20     see it.

21                    The major hurdles that Plaintiffs face in

22     this case are whether or not there's a reversionary

23     interest, what the nature of that ownership interest is.

24     The second step is whether there's been an abandonment; both

25     questions under Pennsylvania State law.

1          We don't think there has been an abandonment.

2    Again, we reiterate the Government's position that Buffalo

3    Township is controlling.

4          However, if the Court does find an

5    abandonment, and we get to the takings issue -- and I want

6    to, again, place our argument in its proper context.  The

7    next question that will arise is what's the nature of the

8    taking, what's the standard that should be applied to

9    determining, you know, what kind of taking this is, and when

10   did the taking occur.

11         And it's clear from the Court's questions to

12   the various parties that you have a good understanding of

13   the timing issue, and that's what leads to these questions

14   of judiciability under Article III and ripeness.  And,

15   again, we don't -- we would argue that it's not ripe, and if

16   there is no physical occupation of the land, therefore, this

17   case is moot at this point.

18         THE COURT:  Are you aware of any cases -- well, I

19   guess there aren't any.  I mean, I'm told that this is the

20   first case which finds itself in this procedural posture

21   where there's an NITU, but the process hasn't run its

22   course.  Is that right?

23         MR. SEMINS:  That is correct, Your Honor.

24         THE COURT:  And that's why you're jumping in here,

25   among other things, and seizing this opportunity to try to

1    get a ruling on that narrow issue of law.  Is that right?

2              MR. SEMINS:  Yes, Your Honor.

3              THE COURT:  All right.

4              MR. SEMINS:  And I'm joined today by Andrea

5    Ferster, general counsel from Rails-to-Trails, who has a

6    wealth of experience in this area and is here to answer any

7    questions that you may have on the technicality of rail

8    banks and how this fits in this scheme.

9              THE COURT:  All right.  Appreciate that.

10             MR. SEMINS:  As far as getting into the temporary

11   takings and the nature of the taking, if we get to that

12   point, essentially the Court would have to use the

13   three-part Penn Central test for regulatory taking.

14                  And under this test, you would have to look

15   at the character of the action, the economic impact of the

16   action, and the -- whether or not there has been some

17   interference with the reasonable-investment-back

18   expectations of the Plaintiffs in this case.

19                  And under the facts in this case, especially

20   given that there is no occupation, physical occupation of

21   the land by a trail manager, the fact that the Plaintiffs'

22   predecessors received consideration for the right-of-way

23   however many years ago, the fact that there's a

24   Transportation Act of 1920 that preempted any

25   State-law-based expectations with respect to railroad

1    rights-of-way, and the fact that there's been no change in

2    use -- and you directed a lot of questions to counsel for

3    the United States about the burdens of trail use on the

4    serving of states.  And, you know, except what we see here

5    is before this becomes a trail, we see no use that would

6    be -- what we see is less use, in fact.  What we have here

7    is inactivity; less of a burden on the serving of states at

8    this point.

9              And so we would argue that it doesn't

10   raise -- doesn't satisfy the three-part Penn Central test

11   for a regulatory taking.  And because there has been no

12   interference with any reasonable-investment-backed

13   expectations by dint of the issuance of the NITU by the STB.

14             THE COURT:  Let me -- and I understand your

15   position on the takings question.  But let me ask you this:

16   Where do I find evidence of the adoption of Pennsylvania --

17   in Pennsylvania, either legislative or judicial, of a

18   shifting public use doctrine?

19             MR. SEMINS:  I am -- I am not aware of any.  I

20   conducted the same search that you did, and I didn't find

21   that particular language of shifting public use --

22             THE COURT:  Well, I don't mean to be too narrow by

23   "have".  I'm not saying you have to find the words.  But

24   where, if anywhere, do I find that Pennsylvania has adopted

25   the concept?

1          MR. SEMINS:  I think I may defer to my colleague
2     here on this point.
3          THE COURT:  You're about to pass the basketball,
4     to use a March Madness metaphor.
5          MS. FERSTER:  Thank you.  Yes, I would like to
6     address that question.  My name is Andrea Ferster.  I'm
7     counsel for the Rails-to-Trails Conservancy.
8          THE COURT:  Keep your voice up, though.  You're
9     not getting through to my court reporter.  There you go.
10         MS. FERSTER:  On the question you asked of where
11    you find evidence in Pennsylvania of the adoption of the
12    shifting use policy, what I would like to do is explain the
13    shifting use policy.
14              The shifting use doctrine has really never
15    been adopted as the shifting use doctrine.  Where it comes
16    into play in the -- in the questions of the ownership of
17    railroad corridors is in this interpretive question that
18    counsel for the United States really focused on, which is
19    the scope of the easement.  And in your questioning, you
20    really focused on when you have a document that conveys a
21    right-of-way for railroad purposes, it doesn't -- as counsel
22    says, it doesn't limit the use, but it doesn't really
23    provide any explanation to the Court of how you interpret
24    what uses are contemplated within that scope.
25              And that's where policies like the

1    Pennsylvania Rails-to-Trails Act really come into play.

2    Because it essentially, rather than being a shifting public

3    use doctrine that applies for purposes of common law, it

4    really is an interpretative aid, almost like a principle of

5    statutory construction.

6            When you are faced with this issue of what is

7    the scope of this railroad easement, and the plain language

8    of the deed doesn't answer that question -- which it

9    doesn't -- then you look to the State policy.  And where the

10   State has evidence, such as strong and clear policy favoring

11   the preservation of railroad corridors through use, interim

12   use as trails, as the Pennsylvania Commonwealth --

13   Commonwealth of Pennsylvania has evidenced, then that is an

14   interpretive question that should tell the Court that this

15   deed should be given a broad scope.

16        THE COURT:  So, really, it's not exactly even like

17   parole evidence, because -- it couldn't be, because the --

18   the intent of the original grantor and grantee, it seems to

19   me, is now lost in the midst of time.

20            And if you have a legislature that comes on a

21   hundred years later, they weren't parties to that original

22   agreement.  If anything, they would be imposing on that

23   original agreement an afterthought that comes on a hundred

24   years down the road, wouldn't they?  Do you see what I'm

25   saying?

1          MS. FERSTER:  Yes.  Yes, I do.  But it is -- that

2     is simply that's how the Courts have applied it in the cases

3     where the Courts have really struggled with the question of

4     the scope of a railroad easement, and they found no evidence

5     in the deed.  And, of course, the transaction took place a

6     hundred years ago, and there's no extrinsic evidence they

7     can point to.  And the statutes authorizing the railroad are

8     equally general and unilluminating.  Then that same

9     policy --

10         THE COURT:  So are you saying that the

11    Pennsylvania statute should be viewed as -- as a legislative

12    pronouncement or sentiment that there exists within every

13    deed, like the deeds we're talking about here, an acceptable

14    purpose that will not trigger a reversionary interest; that

15    being you're on safe ground if you use them for trails?

16         MS. FERSTER:  That's correct.  And, in fact, State

17    legislatures do that all the time on other interpretive

18    issues in interpreting railroad ownership issues.

19              For example, Indiana has a legislative

20    pronouncement that says when abandonment occurs.  They just

21    sliced through this --

22         THE COURT:  But what happens -- that begs the

23    question, though, because here we're talking about a takings

24    claim, allegedly caused by the intricacies of the Federal

25    Rail Banking Act.

1                    But if the Pennsylvania State legislature,

2       for instance, were to pass an Act that didn't simply

3       recognize the benefits of trails, similar to the Federal

4       Act, but said, by the way, we think -- we think because

5       we're all NASCAR fans in the legislature this year, that it

6       would not be an overburdening of the original easement if

7       every railroad right-of-way was converted into a NASCAR

8       track, such that they could fly up and down and -- well, you

9       still have a -- you have a pronouncement from the

10      legislature, but does that make it not a taking?

11              MS. FERSTER:  But I think you have a real

12      difference here.  And I think that counsel for United

13      States, I think, did a good job in explaining that

14      difference.

15                    You are dealing with the scope of this --

16      this deed and the document that does have a parameter in it,

17      and the parameter is that it does have to be a

18      transportation purpose.  And it should be consistent with a

19      railroad purpose, really.  And so the legislature can't, by

20      slate of hand, legislative slate of hand, say, well, we're

21      going to convert these railroad easements into amusement

22      parks or some other purpose that has no ability to be a

23      railroad purpose --

24              THE COURT:  So, really, the State legislature in

25      this case is really nothing more, in your view -- and I

1    don't mean to minimize it -- but nothing more than

2    circumstantial evidence, if you will, that one's original

3    interpretation of the original deed as encompassing uses

4    like this is more likely than not correct; is that right?

5         MS. FERSTER:  I think Courts have used it as an

6    interpretive aid, if that's how you -- if that was your

7    question.

8         THE COURT:  It was.

9         MS. FERSTER:  It's an interpretive aid.  It's

10   because in these situations, it's very difficult to define

11   what the scope of a railroad easement is when you have --

12        THE COURT:  Would a landowner have a viable claim?

13   Would a landowner have -- and I'm not saying they otherwise

14   wouldn't.  But would a landowner have a viable claim if

15   their deed in 1847 said this:  And we are -- we are deeding

16   this to the railroad for railroad purposes and railroad

17   purposes only, and by railroad purposes we mean the movement

18   of railroad cars and freight trains only, to the exclusion

19   of any other horse-drawn, mechanized, or people movement --

20   now you have a tight -- not that they did that.  There was

21   no reason for them to.  But if you had a deed that was that

22   tightly drawn, that could be read in no other fashion, as --

23   as meaning anything other than actual railroad use, would a

24   subsequent grantor of that property 120 years down the road

25   who was in this courtroom have a viable claim?

1          MS. FERSTER:  I don't know if the subsequent owner

2     would have a viable claim in this courtroom.  There have

3     been, in fact, cases where State legislatures have tried to

4     take property by legislative enactment.  And that would be a

5     State Court issue.

6          THE COURT:  Arguably, then, depending upon the

7     specificity of the deed, if the deed is extremely specific,

8     it would not be a stretch for me to say that interim trail

9     use was an inconsistent use, would it?  Because I'm bound by

10    the intent of the original parties, aren't I, if I can find

11    it clearly in the deed?

12         MS. FERSTER:  Well, again, we did view this --

13    started this discussion as a question of the shifting public

14    use.  So the concept does contemplate the shift.

15         THE COURT:  You don't need shifting public use if

16    you have a deed that is awfully darn clear, right?

17         MS. FERSTER:  That's right.  You don't need that

18    doctrine if the deed is a broad transportation --

19         THE COURT:  On the other hand, shifting public use

20    won't help you either, unless arguably that shifting public

21    use can -- is not excluded by the original deed, right?

22    Shifting public use has to derive in some form or fashion

23    from the four corners of the original deed, no matter how

24    unartfully drafted.

25         MS. FERSTER:  That's correct.  That is how the

1    concept has been developed, is the shift has always been

2    from one transportation use to another transportation use.

3          THE COURT:  It is a fiction -- one could argue, it

4    is a fiction, is it not, to -- to permit a usage which may

5    only vaguely have been within the original deed, but could

6    not have been within the contemplation of the original

7    parties, because they weren't thinking a hundred years down

8    the road?

9          MS. FERSTER:  Well, that's the essence of the

10   shifting public use doctrine, is that -- is that a hundred

11   years ago, for example, you were thinking of -- you possibly

12   weren't thinking of light rail.  You were thinking of

13   freight railroad, or you were thinking of horse and buggy.

14   And the concept is the transportation, and the types of

15   transportation evolves over time.

16               And that under the shifting use doctrine,

17   you're not going to confine a transportation easement to the

18   use that's in vogue at the time the easement was granted,

19   simply because the grantors at that time could not

20   contemplate a future use.

21         THE COURT:  All right.  Thank you very much.

22   Appreciate it.  Do you have anything you want to say

23   briefly?

24         MR. COHEN:  Yes, Your Honor.  First of all, to

25   address the Court's discussion of a stay --

1          THE COURT:  Yeah, let's talk about that.

2          MR. COHEN:  Plaintiffs do not oppose that either.

3    I mean, you know, I --

4          THE COURT:  On the other hand -- and I'm not sure

5    I do either.  But I can't stand having my cases stayed

6    inordinately and be at the mercy of some entity that is

7    other than myself, because I don't like old cases.  And they

8    have a tendency to get that way.  That doesn't mean we

9    couldn't revisit the issue.

10          MR. COHEN:  Right.  Well, all I'm suggesting, Your

11   Honor, is that we filed this case because if we -- if we sat

12   on our hands waiting until these entities who we have no

13   control over either decided to or not to enter into a trail

14   use agreement, then, you know, we could have blown the

15   statute of limitations, and we wouldn't have any claim.

16          But we have filed -- I think it does make

17   sense in many respects to give some period of time, perhaps,

18   to see if there is some fruition --

19          THE COURT:  Because I have a big loophole in my

20   facts.  I don't know what's going to happen.  Is there any

21   way under the regulatory scheme to force a resolution of

22   this administrative thing?

23          MR. COHEN:  Your Honor, I have seen on a couple of

24   occasions -- and I'm sure other counsel can verify this or

25   not -- where after multiple extensions, the STB says this is

1    the last one; no further extensions.  And, in fact, I think

2    to the extent that we can -- we have standing, meaning

3    Plaintiffs and the certified class in this case --

4         THE COURT:  Can't you intervene in that?  Have you

5    intervened in that administrative thing?

6         MR. COHEN:  Not yet.  But we're -- I'm going to.

7    We're going to, Your Honor.  We're going to intervene,

8    because it is prejudicing our rights in this case by their

9    inaction.

10         And the only other thing I would suggest to

11    the Court is that I think, even though the parties did brief

12    some of the deeds, we haven't briefed all of them.  And if

13    part of the Court's analysis is whether or not interim trail

14    use exceeds the scope of the deeds, then I don't think it's

15    sufficient to just look at one or two as representative.  It

16    may be that we need to go -- this case, unlike other cases,

17    there's not 500 deeds.

18         THE COURT:  How many deeds are we talking about?

19         MR. COHEN:  I would say, what, maybe 30, 40 at the

20    most.  Because a lot of them are -- the ones that are

21    warranty deeds are not part of the case.  The fee deeds

22    aren't part of the case.  The only deeds that are really

23    pertinent to the Court are really the ones where there is an

24    easement for railroad purposes.  Those deeds are probably, I

25    would say, two dozen.

1          And then we have the -- the only two

2    condemnation proceedings that we have that we were able to

3    find, there's just two of them, and those have already been

4    introduced.

5          THE COURT:  But let me ask you this:  If they go

6    ahead and come to a deal here in April or May or whenever,

7    and they do that, at that point in time isn't the -- isn't

8    the situation ripe for you to go to Common Pleas and try to

9    do what you can't do right now?

10         MR. COHEN:  By that, you mean a quiet title

11   action?

12         THE COURT:  Quiet title action.  See, I guess what

13   I'm saying is this:  And, you know, we're open for business

14   here all the time.  And the only requirements we have is I

15   have jurisdiction and there's a case in controversy and it's

16   ripe.

17         I'm going to -- once we break here, before we

18   do, I'm going to be inclined to stay this case, even though

19   nothing would be happening except me, you know, issuing an

20   opinion here at some point.  There might have to be some

21   future briefing.

22         But if what your clients are really

23   interested in is the recovery of the property, as opposed to

24   damages for a taking, aren't you on the wrong side of the

25   fence here, the judicial fence?  Not that I blame you.  But

1   might it -- mighten it come to pass that the final chapter

2   in this litigation isn't finished with me, but with some

3   State Court Judge?

4           MR. COHEN:  That could very well be, Your Honor,

5   especially if the railroad and the trails group fail to

6   reach an agreement.  At that point there will be an

7   abandonment under -- under Pennsylvania law.  We can go into

8   Court of Common Pleas and file a quiet title action.

9           The more problematic case would be if they do

10  reach an agreement, and if the Court were to find that there

11  is no abandonment, then at that point --

12          THE COURT:  That might collaterally estop you in

13  State Court.

14          MR. COHEN:  Yes.  And at that point, then, I think

15  the only remedy would be a take -- through the Tucker Act,

16  the takings claim on the ground that the interim trail use

17  exceeds the scope of the easement that was conveyed by the

18  original grantor.

19          THE COURT:  All right.  Take a seat.  Let's just

20  talk briefly here.  In terms of a stay, I'm not exactly sure

21  what I would be staying, because there's no active discovery

22  going on or anything like that.  So I guess it's -- is it

23  somewhat superfluous for me to do that?  What sense does it

24  make if I just wait and, you know, 60 days hence or so order

25  the parties to get back to me and report on what, if

1  anything, has occurred?

2        MR. COHEN:  That's fine with Plaintiffs, Your

3  Honor.

4        MS. TARDIFF:  Your Honor, I would be amenable to

5  that as well.  I suggest probably 90 days.  My conversation

6  with the railroad's attorney on Tuesday, he characterized it

7  as probably a matter of months.  So I'd say probably two to

8  three months before --

9        THE COURT:  But I will say this:  If this thing

10  just keeps -- I mean, if there's no light at the end of this

11  tunnel, you know, this case gets older, my motion gets

12  older -- and I don't like old cases, I don't like old

13  motions -- then we'll have to reanalyze, you know, where

14  we -- where we are.

15        I mean, the other possibility -- and I'm not

16  suggesting it would come to this.  But -- well, if it looked

17  like you were years before you were going to get a decision

18  here from the STB on this thing, or the parties, then the

19  other possibility, I suppose, would be a -- a voluntary

20  withdrawal without prejudice.

21        But I presume that the only way that you'd be

22  willing to do that would be if there was an agreement by the

23  United States or any other interested party that if and when

24  you decided to refile, there would not be a limitations

25  argument that was raised.

1               MR. COHEN:  Yes, Your Honor, that would have to

2      be --

3               THE COURT:  That would be your only concern,

4      wouldn't it?

5               MS. TARDIFF:  Your Honor, if I could address that,

6      that does present a problem for us.  I mean, we would be

7      more amenable to the stay.

8                    The statute of limitations in these takings

9      cases is jurisdictional, so we don't have the ability

10     to control it or --

11              THE COURT:  I understand that.

12                   Now, let me ask you one other question, and

13     then we're going to break.  And this is just a -- and I'm

14     going to go look at the case.  How can a cause of action

15     accrue if you haven't had any damages?  Conceptually.  Does

16     anybody know how that can happen?  Do you?  Do you?

17              MS. TARDIFF:  Well, I can attempt to answer.  This

18     is -- this is really the precise issue that I think the

19     Federal Circuits struggled with in the Caldwell case.  And

20     there's a dissenting opinion by Judge Newman in that case,

21     and I think in Barclay as well, where she says just that;

22     you don't know what the damages or the extent of the damages

23     are until this process works itself out.

24                   The majority, however, was that there is

25     enough for the statute of limitations to be triggered in

1  these cases when a NITU is issued, even if you don't know,

2  you know, the extent of the possible damages.

3       THE COURT:  All right.  What we'll do is I'm going

4  to order -- we're going to set a status conference up, a

5  telephonic status conference in 60 days.  At that point

6  we'll get you on the line, and we'll see where we're going.

7  If things have come to a resolution, fine.  If not, we'll

8  probably wait a period longer and see what happens.

9       If they have, you indicated, Mr. Cohen, you

10 might want to do some additional briefing.  It might be

11 appropriate that there be some supplemental motions filed at

12 that point, based upon what the lay of the land is.

13      But all that is for the future, and we'll

14 decide where we go from there.

15      All right, thank you very much.

16

17      (Hearing concluded at 3:32 p.m.)

18

19

20

21

22

23

24

25