IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT TROHA and FREDERICK BIGNALL, on behalf of themselves and all others similarly situated,<br><br>                 Plaintiffs,<br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>                 Defendant. | C.A. No. 05-191 Erie<br>District Judge McLaughlin |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

### I. INTRODUCTION

The Plaintiffs, a certified class pursuant to Fed. R. Civ Pro. 23(b)(3), consist of individuals who own land that abuts or is traversed by a recreational trail in Elk and Cameron Counties, Pennsylvania. In this action, brought pursuant to the "Little Tucker Act," 28 U.S.C. § 1346(a)(2), they contend that by virtue of the operation of the National Trails System Act, 16 U.S.C. § 1241 et seq., they have been deprived of reversionary property interests in various portions of the recreational trail without just compensation in violation of the Fifth Amendment of the United States Constitution. Presently pending before the Court are the parties' cross-motions for summary judgment.[1] For the reasons which follow, the Defendant's motion for summary judgment will be granted and the Plaintiffs' motion denied.

### II. BACKGROUND

---

[1] Also before the Court is a brief in support of Defendant's motion for summary judgment submitted by *Amicus Curaie* Rails-to-Trails Conservancy ("RTC").

This case concerns a railroad right-of-way formerly operated by Allegheny & Eastern Railroad, Inc., ("A&E") in Cameron and Elk Counties, Pennsylvania. (Joint Statement of Facts, ¶ 1). The portion of the right-of-way at issue totals 18.9 miles in length and was originally constructed in 1864 by the Philadelphia and Erie Railroad Company. (Joint Statement, ¶ 3). A&E acquired its ownership interest in the right-of-way in 1985. (Joint Statement, ¶ 4). Following the acquisition, A&E did not utilize the line for common carrier freight services. (Joint Statement, ¶ 20). However, other railroad carriers occasionally used the line for special contract services through approximately late 2000. (Joint Statement, ¶¶ 21-22).

On August 8, 2003, A&E stated in an Environmental/Historic Report filed with the Surface Transportation Board ("STB")[2] that "[n]o service has been provided on this line by Applicant for over two years. Abandonment of the line will allow Applicant to salvage the track and materials. At this time, there appears to be no alternative to the proposed action." (Joint Statement, ¶ 23). A&E also noted that "[a]ll track removal work will be done on top of the road bed. Nothing beneath the road bed will be distrubed." A&E further stated that it would leave in place, unaltered, certain structures along the right-of-way, such as archways, culverts, and bridges. (Joint Statement, ¶ 24).

On September 11, 2003, A&E filed a Notice for Exemption of Abandonment seeking authorization from the STB to abandon rail service over the right-of-way. (Joint Statement, ¶ 7). The STB issued an exemption authorizing abandonment of the line, with the exemption set to become effective on October 31, 2003. (Joint Statement, ¶ 8). Prior to that date, however, Elk County and Cameron County each filed a request to "railbank" the railway corridor pursuant to Section 8(d) of the National Trails Systems Act, 16 U.S.C. § 1247(d) (hereinafter, the "Railbanking Act") (Joint Statement, ¶ 9).

---

[2] The Surface Transportation Board ("STB") is the agency charged under the Interstate Commerce Act, 49 U.S.C. 10101, with regulating rail carriers that provide transportation over any part of the interstate rail network. Prior to the creation of the STB by Congressional act effective January 1, 1996, this role was filled by the Interstate Commerce Commission ("ICC").

The Railbanking Act, designed to preserve the country's rapidly disappearing railway corridor infrastructure for future rail service and energy efficient transportation uses, permits inactive railroad corridors to be used on an interim basis as trails. The Railbanking Act is triggered when a railroad desires to terminate its common carrier obligation to provide freight rail service on a line, an action requiring approval from the STB. When a qualified entity desires to negotiate with the railroad concerning the preservation of a corridor for future rail and interim trail use, it must request that the STB issue a railbanking order (known as a Certificate of Interim Trail Use ("CITU") or a Notice of Interim Trail Use ("NITU")) by filing a statement of willingness to assume legal or financial responsibility over the corridor until such time as it is needed again for rail service. 49 C.F.R. § 1152.29(a). Where a NITU or CITU is issued and a railbanking agreement is reached between a railroad and a trail sponsor, the corridor is "railbanked" and remains subject to the federal authority of the STB for so long as the trail use continues, and the corridor remains intact and potentially available for reactivated rail service. Birt v. STB, 90 F.3d 580, 583 (D.C. Cir. 1996).

In this case, the STB issued a NITU for the subject right-of-way on October 30, 2003, granting A&E and Elk and Cameron Counties 180 days within which to negotiate a railbanking and interim trail use agreement. (Joint Statement, ¶ 12). From 2003 through 2008, the parties sought and obtained numerous extensions of this negotiating window from the STB. (Joint Statement, ¶¶ 29-42). On November 7, 2006, in the midst of the ongoing negotiations, Elk County filed a notice with the STB indicating that the West Creek Recreational Trail Association ("WCRTA") had been substituted as the proposed trail sponsor. On November 15, 2006, A&E indicated that it had no objection to the substitution of the WCRTA as trail sponsor. (Joint Statement, ¶ 18). A&E eventually reached an agreement with the trail sponsor and the right-of-way was railbanked on or about September, 2008.

Plaintiffs advance two arguments in support of their contention that a "taking" has occurred. First, Plaintiffs contend that A&E's property interest in the railroad right-of-way would have been deemed to have been abandoned under state law but for the operation of the Railbanking Act.

Alternatively, Plaintiffs contend that the utilization of the right-of-way as a recreational trail exceeds the scope of the use permitted in some of the original conveyances resulting in a reversion of the Plaintiffs' property interests.[3]

This matter is fully briefed and is now ripe for disposition. I address each of the Plaintiffs' contentions in turn below.

## II.  STANDARD FOR REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3rd Cir.1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3rd Cir.1993). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3rd Cir.1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

---

[3]   The nature of the specific deeds at issue will be discussed more fully below.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must ... be sufficient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3rd Cir.1994), *abrogated on other grounds*, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3rd Cir.1999).

Notably, "[t]he rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3rd Cir.2008). As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3rd Cir.1968)).

### III. ANALYSIS

In Preseault v. United States, 494 U.S. 1, 22 (1990) ("Preseault I"), the owners of a reversionary interest in a railbanked right-of-way challenged the constitutionality of the Railbanking Act as an invalid exercise of Congressional power and sought compensation on the grounds that it "takes private property without just compensation." Preseault I, 494 U.S. at 10. Although the Court rejected the Preseault's constitutional challenge, it acknowledged that the operation of the Railbanking Act might give rise to a takings claim if properly brought pursuant to the Tucker Act. Preseault I, 494 U.S. at 16. In a frequently cited concurrence, Justice O'Connor explained the

circumstances under which a takings claim might be successfully advanced. In this regard, Justice O'Connor stated:

> The scope of the [ICC's] authority to regulate abandonments, thereby delimiting the ambit of federal power, is an issue quite distinct from whether the Commission's exercise of power over matters within its jurisdiction effected a taking of petitioner's property. Although the Commission's actions may pre-empt the operation and effect of certain state laws, those actions do not displace state law as the traditional source of the real property interests. The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights. Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment.
> 
> \* \* \* \* \* \* \*
>
> The ICC may possess the power to postpone enjoyment of reversionary interest, but the Fifth Amendment and well-established doctrine indicate that in certain circumstances the Government must compensate owners of those property interests when it exercises that power. . . . [T]he existence of a taking will rest upon the nature of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest.

Id. at 22-24 (O'Connor, J., concurring) (internal citations omitted).

Following the Supreme Court's decision in Preseault I, the Preseaults brought a compensation claim pursuant to the Tucker Act. Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996) ("Preseault II"). The Preseaults contended that the railroad right-of-way at issue had been abandoned under state law prior to railbanking because rail service had not operated over the line in more than a decade and all railroad equipment, including tracks, switches, and bridges had been removed. Consequently, they argued that the railroad's ownership interest in the right-of-way had been extinguished and that the right-of-way would have reverted to the holders of reversionary property rights but for the operation of the Railbanking Act. Id. at 1529-33.

Relying in part on Justice O'Connor's concurrence in Preseault I, the Court of Appeals for the Federal Circuit set forth the appropriate analytical approach in determining whether a taking has occurred as a result of the operative effect of the Railbanking Act:

> The determinative issues in the case, then, are three: (1) who owned the strips of land involved, specifically did the Railroad by the 1899 transfers acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.
>
> \* \* \* \* \* \* \*
>
> Clearly, if the Railroad obtained fee simple title to the land over which it was to operate, and that title inures, as it would, to its successors, the Preseaults today would have no right or interest in those parcels and could have no claim related to those parcels for a taking. If, on the other hand, the Railroad acquired only easements for use, easements imposed on the property owners' underlying fee simple estates, and if those easements were limited to uses that did not include public recreational hiking and biking trails ("nature trails" as Justice Brennan referred to them), or if the easements prior to their conversion to trails had been extinguished by operation of law leaving the property owner with unfettered fee simples, the argument of the Preseaults becomes viable.

Id. The Court then examined the original instruments of conveyance to determine, under Vermont law, the nature of the property interest conveyed to the railroad. After a detailed review of applicable Vermont law, the Court determined that the railroad's property interest consisted of an easement "for railroad purposes." Id. at 1537. It next addressed the scope of that property interest in order to determine whether an easement for railroad purposes was sufficiently broad to encompass use as a recreational trail:

> When the easements here were granted to the Preseaults' predecessors in title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained? We think not. Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly

7

> different. In the one case, the grantee is a commercial enterprise using the easement in its business, the transport of goods and people for compensation. In the other, the easement belongs to the public, and is open for use for recreational purposes, which happens to involve people engaged in exercise or recreation on foot or on bicycles. It is difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.

Id. at 1542-43. In a plurality decision, the Court ultimately concluded that the Preseaults' reversionary property interest had been "taken" as a result of the federal Railbanking Law. Id. at 1552.[4]

For our purposes, however, as will be discussed more fully below, the critical import of Preseault II is not the result of the case but the analytical framework utilized in reaching that result (i.e., determining what interests were acquired by the railroad in the original transaction, whether those interests have been extinguished through abandonment, and/or whether the current intended use exceeds the scope of those acquisitions). Each of these determinations is governed by applicable state law. Id. at 1534; ("Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the ICC's recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim."); see also Preseault I, 494 U.S. at 20 ("State law generally governs the disposition of reversionary interests."). Accord Lucas v. Township of Bethel, 319 F.3d 595, 603 (3rd Cir. 2003) (holding that state property law controls the disposition of a railroad right-of-way).

---

[4] Since the inquiry as to whether property has been abandoned and/or whether the scope of a railroad easement encompasses recreational trail use is state law driven, courts in various jurisdictions have reached different conclusions in this regard. See, e.g., Toews v. United States, 376 F.3d 1371, 1376-77 (Fed. Cir. 2004) (concluding under California law that use as a recreational trail "for walking, hiking, biking, picnicking, frisbee playing . . . is not the same use made by a railroad, involving tracks, depots, and the running of trains."); Chevy Chase Land Co. v. United States, 230 F.3d 1375, 13 (Fed. Cir. 1999) (applying Maryland law and rejecting a takings claim "on the state law ground that the original easement authorizes the recreational trail use" and because "the activities of the railroad . . . did not work an abandonment of the easement.").

      **A.     Did railbanking forestall an abandonment that would have otherwise occurred under state law?**

Given that state law governs the disposition of reversionary interests, an analysis of Plaintiffs' claim that A&E abandoned their interest in the right-of-way properly begins with an examination of Buffalo Township v. Jones, 813 A.2d 659 (Pa. 2002), and Moody v. Allegheny Valley Land Trust, 976 A.2d 484 (Pa. 2008).

In Buffalo Township, the township sought a permanent injunction preventing the owners of property adjacent to a railbanked former railroad right-of-way from erecting barriers to prevent access to newly developed recreational trails. Buffalo Township, 813 A.2d at 662. The property owners, each of whom held reversionary interests in the land comprising the right-of-way, argued that the right-of-way had been abandoned by the railroad prior to railbanking, causing a reversion of their property interests. Id. at 663. The trial court granted the requested injunction, holding that the railroad had not abandoned the right-of-way by converting it from a railroad to a recreational trail. The Commonwealth Court upheld the grant of the injunction, and the property owners appealed to the Pennsylvania Supreme Court. Id. at 662.

The Court described the relevant inquiry as to whether property has been abandoned under Pennsylvania law as follows:

> In evaluating whether the user abandoned the property, the court must consider whether there was an intention to abandon the property interest, together with external acts by which such intention is carried into effect. Lawson v. Simonsen, 490 Pa. 509, 417 A.2d 155, 160 (1980); see also Burnier v. Dep't of Envtl. Resources, 148 Pa.Cmwlth. 530, 611 A.2d 1366, 1368 (1992). In order to establish the abandonment of a right-of-way, the evidence must show that the easement holder intended to give up its right to use the easement permanently. Thompson v. R.R. Preservation Society, 417 Pa.Super. 216, 612 A.2d 450, 453 (1992). "Such conduct must consist of some affirmative act on his part which renders use of the easement impossible, or of some physical obstruction of it by him in a manner that is inconsistent with its further enjoyment." Id. (emphasis in original); see also Piper v. Mowris, 466 Pa. 89, 351 A.2d 635, 640 (1976). Mere nonuse by the railroad does not amount to abandonment. Lawson, 417 A.2d at 160; see also Burnier, *supra*.

Id. at 664-65. The Court acknowledged that the railroad had taken some action consistent with an intent to abandon the right-of-way, "such as filing a request to abandon rail service with the ICC and entering into an agreement . . . for salvage of the rails." Id. at 665. However, the Court ultimately held that the evidence supported the conclusion that the railroad had *not* exhibited an intent to abandon based on the fact that the railroad had "participat[ed] in ongoing negotiations with Buffalo Township for the use of the land and expressly retain[ed] the right to reenter the land for future railroad use in the deed." Id. The Court concluded that the latter factors "demonstrated [the railroad's] intent to *retain* an interest in the right-of-way," rather than abandon it. Id at 666 (emphasis in original).

A similar result was reached in Moody, wherein the plaintiffs, owners of parcels of land abutting a railroad right-of-way, sought a declaratory judgment that the right-of-way had been abandoned, triggering their reversionary interests. Active rail service across the subject right-of-way had been abandoned with ICC permission in 1984. Id. In 1992, the railroad, Conrail, transferred the right-of-way to the Allegheny Valley Land Trust in order to railbank and preserve the corridor as an interim recreational trail and for future rail service. The railbanking agreement, however, did not explicitly bind the railroad to "resuscitate rail service on the right-of-way in the future if directed to do so." Id. at 488. The plaintiffs argued that Conrail's abandonment of active rail service on the line, coupled with the railroad's failure to agree to be bound to restore service, demonstrated the requisite intent to abandon the right-of-way. The trial court agreed and entered an order declaring that the right-of-way had been abandoned and that the servient estates were no longer subject to the easements. Id. at 488. The Superior Court reversed, holding that evidence of cessation of rail service accompanied by a transfer of the right-of-way to a railbanking sponsor did not support a finding of abandonment under Pennsylvania law. Id. Following an appeal, the Supreme Court of Pennsylvania affirmed.

Citing Buffalo Township, the Court reiterated that, under Pennsylvania law, a property is not deemed to have been abandoned unless the evidence demonstrates both "an intention to abandon the

property interest" and "external acts by which such intention is carried into effect." Moody, 976 A.2d at 488 (citing Buffalo Township, 813 A.2d at 664-65).  The Court then rejected the plaintiffs' argument that Conrail's abandonment of active service on the line demonstrated an intent to abandon the right-of-way entirely:

> Importantly, Conrail's intent to abandon rail service on the right-of-way must not be confused with Conrail's alleged intent to abandon the right-of-way itself, an intent that is incompatible with the actions Conrail took in selling the right-of-way. It is beyond dispute that Conrail intended to abandon its rail service on the right-of-way, and took steps to effectuate that by, among other things, selling the right-of-way to AVLT. However, as the Superior Court wisely observed, *the evidence presented cannot support both the conclusion that Conrail meant to extinguish the right-of-way via abandonment and that it meant to sell the right-of-way to a qualified railbanking organization such as AVLT*.

Moody, 976 A.2d at 491 (emphasis added).  The Court also determined that Conrail's failure to agree to be bound to revive service on the line was not inconsistent with "the goals and procedures of private railbanking."  Id. at 488.  Consequently, the Court held that the right-of-way had not been abandoned under Pennsylvania law:

> Viewing the transactions in the instant case in their entirety, we hold that Conrail's sale of the right-of-way to a qualified railbanking organization like AVLT, that filed a Declaration of Railbanking at the time the deed was recorded, did not result in abandonment of the right-of-way. Conrail owned a right-of-way; it sold that right of way to an organization that a) planned to use it as a right-of-way and b) planned to hold it subject to revitalization of rail lines in accordance with the requirements of Section 1247(d) of the National Act and consistent with the railbanking requirements established in Buffalo Township, 813 A.2d at 670.

Moody, 976 A.2d at 488-89.  Against the backdrop of Buffalo Township and Moody, I now turn to examine the actions taken by A&E to determine whether an abandonment occurred.

As an initial matter, Plaintiffs argue that "in determining whether the Railroad in this case abandoned the right-of-way under Pennsylvania law, the Court must analyze whether abandonment would have occurred absent, or but for the Trails Act, under a 'normal abandonment proceeding.'" See Plaintiffs' Supplemental Reply Memorandum, p. 3 (citing Caldwell v. United States, 391 F.3d

1226 (Fed. Cir. 2004)). Relying on dicta in Caldwell,[5] Plaintiffs contend that the Court must "exclude from consideration acts taken under the Trails Act in determining whether abandonment occurred under Pennsylvania law." See Plaintiffs' Supplemental Brief, p. 10. I disagree. On a practical level, such an approach is unworkable and would require the court to disregard the actions that A&E *actually* took in connection with the railbanking process and, instead, speculate as to what actions A&E *might* have taken in the absence of the Railbanking Act. Moreover, Plaintiffs' approach is inconsistent with the methodology utilized in Moody and Buffalo Township where the courts specifically considered actions taken by the railroad in conjunction with the railbanking process as part of their overall calculus relative to abandonment. Moody, 976 A.2d at 488-89; Buffalo Township, 813 A.2d at 665-66.

Plaintiffs next contend that A&E demonstrated the requisite intent to abandon and took action consistent therewith when it sought authorization to abandon service on the rail corridor, transferred the right-of-way to WCRTA, and removed rails and ties from the railroad bed. (See Plaintiffs' Supplemental Memorandum, Dkt. #58, pp. 7-8). As noted above, however, Moody flatly rejected the argument that discontinuing active rail service across a right-of-way is conclusive of a permanent intent to abandon the right-of-way itself. Moody, 976 A.2d at 491. Likewise, the Buffalo Township decision makes clear that the act of removing and salvaging tracks, ties, and other railroad materials is not sufficient in and of itself to establish an abandonment. Buffalo Township, 813 A.2d at 666.

In contrast, Defendants point out that A&E continuously negotiated with several potential trail sponsors in an attempt to reach an agreement to railbank and preserve the right-of-way. (Joint Statement, ¶¶ 29-47). Moreover, A&E expressly retained the right to reacquire the land from the WCRTA and reactivate rail service at any time in the future that it should choose to do so, as required

---

[5] In Caldwell, the Federal Circuit held that a Fifth Amendment takings claim accrues for purposes of the six-year statute of limitations under the Tucker Act when a NITU is issued by the STB. Id. at 1236. The Court had no occasion to address or consider whether any taking had actually occurred in that case. Id.

by the Railbanking Act. (Joint Ex. 35, p. 12). The Railbanking Agreement further protects A&E's ongoing interest in the right-of-way by requiring that WCRTA retain bridges, roadbeds, and other structures necessary for rail service to resume in the future. (Joint Ex. 35, p. 3). Collectively, these actions support the conclusion that A&E intended to preserve and retain the right to make use of the right-of-way at a future time, rather than abandon it. Moody, 976 A.2d at 488-89; Buffalo Township, 813 A.2d at 665-66. Indeed, the facts here present even stronger evidence of non-abandonment given that A&E, unlike the railroad in Moody, explicitly preserved the right to reactive service in the future. Consequently, consistent with Moody and Buffalo Township, I find that the evidence described above demonstrates that A&E's actions were at all times consistent with an intent to preserve the right-of-way for future rail use rather than to abandon it.

      **B.**     **Do railbanking and interim trail use exceed the scope the easements?**

Alternatively, Plaintiffs contend that the scope of the property right conveyed to the railroad in the original instruments of conveyance was not sufficiently broad, in certain instances, to encompass railbanking and interim trail use.[6] See Preseault II, 100 F.3d at 1533. Because we "look

---

[6] The parties have categorized the deeds relevant to the right-of-way into the following seven categories and have stipulated as to the nature of the property interest acquired by the railroad for each:

    Category One - Warranty deeds
    Category Two - Warranty deeds with "as long as" language
    Category Three - Grant deeds with release language
    Category Four - Donation and/or release deeds
    Category Five - Unrecorded or lost deeds
    Category Six - Condemnation awards
    Category Seven - Parcels with no known conveyance documentation

With regards to those deeds in Category One (Warranty Deeds), Category Four (Donation and/or Release Deeds), and Category Five (Unrecorded or lost deeds), Plaintiffs do not contest entry of summary judgment in favor of Defendants. Similarly, in light of the decision in Moody, Plaintiffs have conceded summary judgment as to 3 of the 4 deeds in Category Three (Grant Deeds With Release Language). The remaining deed categories, and the Category Three deed identified as parcel 4-2, are analyzed more fully below.

to state law to determine the scope of the easement in question," the Pennsylvania Supreme Court's decision in Moody is again instructive. See Moody, 976 A.2d at 490 (recognizing that "both Preseault cases look to state law to determine the scope of the easement . . .") (citing Preseault II, 100 F.3d at 1534). In Moody, the instrument of conveyance referred to the easement as a "right of way" and contained the following *habendum* clause:

> To have and to hold the said rights and privileges to the use of [the railroad], so long as the same shall be required for the uses and purposes of said Road, in as full, perfect and ample a manner as may be necessarily required for the purposes hereby intended.

Id. at 490-91. Addressing the scope of that easement, the Court held:

> The plain language of the deed's *habendum* clause refers to the right-of-way over Appellants' land as a "Road." It is this property interest in the "Road" that Conrail conveyed to the AVLT. A road is "[a]n open, generally public way for the passage of vehicles, people, and animals," "[t]he surface of a road; a roadbed," "[a] course or path," or "a railroad." By the plain language of the deed's *habendum* clause, there is no reason to confine our understanding of the easement grant as allowing rail service, but not preservation for future rail service. Fundamentally, the deed and its *habendum* clause create an easement to allow travel through the servient estates. Subsequent holders of the easement may not transgress its boundaries, but they do not transgress the use for which it was granted when they use it for hiking and biking. Interim trail use is consistent with the terms of the easement grant.

Id. at 491 (footnotes omitted). The Moody Court concluded that an easement for railroad purposes and a future use as a public recreational trail were not necessarily mutually exclusive. Moody, 976 A.2d at 490. The Court emphasized that "characterizing the right-of-way in question as a 'railroad right-of way' does not so limit it, no more than characterizing a right-of-way as a driveway limits the owner of such a thing to driving on it, rather than walking or biking on it." Id. In concluding that no taking had occurred, the Court observed:

> Railbanking, properly conceived, is a method of rail maintenance and preservation rather than a departure from the intentions and purposes of the easement at the time it was granted. The deed's *habendum* clause grants the easement for "so long as the same shall be required for the use and purposes of said Road, in as full, perfect and ample a manner as may be necessarily required for the purposes hereby intended." Railbanking provides conservation of this

> right-of-way in a rail-ready state during a period when rail service is not feasible, and this is not a departure from the intended "use and purposes" of the easement. On the contrary, consistent with the terms of the easement and the policies behind the National Act, railbanking preserves rail networks for the purposes of rail service in the future. Preservation of a resource for the purposes of using that resource as it was used initially is not a departure from the broadly-stated terms of the easement. This would be true if Conrail were simply halting train service for a period of years in order to update track hardware, and it remains true here. The fact that hikers and bikers will be allowed to use the easement in the interim period is not only beneficial from a policy perspective, it also allows investment in the upkeep of rail networks-for rail purposes-that would not otherwise be available. Although we . . . wish to protect the constitutional rights of the Appellants, we cannot agree that those rights are transgressed when the language of the deed's *habendum* clause is broad and the purposes of railbanking are so beneficial for rail service, which is of course the very purpose for which the easement was sought and granted in the first place. The property rights of the Appellants have in no way been changed by this railbanking. No taking has occurred.

Id. at 492. Since a determination as to whether trail use exceeds the scope of the original easements is dependent on the specific language in the conveyances, I will now address, in turn, each of the respective deed categories. See Moody, 976 A.2d at 490 (quoting Preseault II, 100 F.3d at 1533).

### Category Two (Warranty Deeds With "So Long As" Language)

There are two deeds contained in this category. The first, referred to as the Halsey deed, provides as follows:

> I do for myself, my heirs and assigns, covenant and agree to grant and convey to the said [Railroad], a strip of land four rods in width, *(as long as the same is used as a Rail Road and when not so used to revert back to Halsey his heirs and assigns*.) – and such additional width as may be required and necessary in the construction and use of said road at cuttings and embankments, one-half thereof on each side of the centre line of said Railroad, extending as far in length as the said Railroad may pass over my land, as soon as said conveyance may be demanded by said Company, or its agent, giving and granting to the said Company, their officers, agents and workmen, until the said conveyance shall be executed, *the full right to enter upon, use and occupy said land for the purposes of said Railroad*, after said road shall have been permanently located through the land now owned by me as aforesaid.

(Plaintiff's Second Supplemental Memorandum, Dkt. #70, Ex. A) (emphasis added). The second, the Keystone Powder deed, contains the following *habendum* clause:

> TO HAVE AND HOLD ALL and singular the rights, liberties, and privileges above described and hereby granted or mentioned and intended so to be, the appurtenances, unto the said [Railroad], its successors and assigns forever: IT BEING UNDERSTOOD AND AGREED, by and between the parties hereto, *that in the event of the said Railroad Company ceasing to use said strip of land above described for railroad purposes*, the same shall thereupon revert to the said Keystone Manufacturing Company, its successors and assigns . . .

(Plaintiff's Second Supplemental Memorandum, Dkt. #70, Ex. B) (emphasis added). The parties have stipulated that these deeds conveyed a fee simple determinable[7] to the railroad, with the grantors retaining a reversionary interest that is triggered if the grantee railroad company or its successors cease to use the land "for railroad purposes." (Joint Appendix, Ex. 2).

With respect to the Halsey and the Keystone Powder deeds, Plaintiffs contend that the easements that were granted for railroad purposes were not sufficiently broad to encompass use as a recreational trail. As made clear in Moody, however, "there is no reason to confine our understanding of the easement grant as allowing rail service, but not preservation for future rail service." Id. at 491. Rather, "[r]ailbanking provides conservation of this right-of-way in a rail-ready state during a period when rail service is not feasible, and this is not a departure from the intended 'use and purposes' of the easement." Id. Use by "hikers and bikers . . . allows investment in the upkeep or rail networks - *for rail purposes* - that would not otherwise be available." Id. at 492 (emphasis added). As such, "the purposes of railbanking are . . . beneficial for rail service, which is of course the very purpose for which the easement was sought and granted in the first place." Id. Therefore, consistent with Moody, I conclude that an easement for railroad purposes is sufficiently broad to encompass use as a recreational trail.

---

[7]    Black's Law Dictionary defines a fee simple determinable as "[a]n estate that will automatically end and revert to the grantor if some specified event occurs . . ."

With respect to the Halsey deed, Plaintiffs highlight the following language: "*as long as the same is used as a Rail Road and when not so used to revert back to Halsey his heirs and assigns*." Plaintiffs also point to language in Moody where the court observed that the deed contained no language "specifying that the easement terminates upon cessation of *rail service*," implying the possibility of a reversion under those circumstances. Id. at 492. They argue that the language in the Halsey reversionary clause and the hypothetical in Moody set forth above are synonymous and, consequently, the recreational trail use exceeded the scope of the easement. I disagree.

First, the language in Moody relied upon by the Plaintiffs is clearly dicta. More fundamentally, however, the hypothetical posited in Moody envisions the cessation (presumably permanent) of *active* rail traffic on the right-of-way. In contrast, the phrase "used as a Rail Road" in the Halsey deed is, in my view, broader in scope and more akin to the language of the actual deed in Moody which granted the easement for "so long as the same shall be required for the uses and purposes of said Road." Railbanking and rail preservation were found to be consistent with "use as a Road" in Moody. For the same reason, I conclude that railbanking and trail use do not exceed the scope of the easement in the Halsey deed.

**Category Three (Grant Deeds With Release Language)**

Plaintiffs concede summary judgment on all of the deeds in this category except for that originally conveyed by Jonathan Campbell. The Campbell deed states:

> KNOW ALL MEN THESE PRESENTS that we Jonathan W. Campbell and George Thayer of Shippen Township Cameron County and State of Pennsylvania for in consideration of the sum of fifty dollars to us in hand paid by the said [Railroad] the receipt whereof is hereby acknowledged have granted, bargained sold released and transferred and by these presents do grant, bargain, sell and transfer to the said [Railroad] its successors and assigns a strip of land across that certain piece of land situate in the said Township of Shippen, County of Cameron and State of Pennsylvania adjoining the lands of James Piersoll on the West and other lands of George Thayer on the East and across which the said Company have located its Railroad, this strip being about seventy rods in length more or less, and four rods in width, and such additional

> width as may be necessary at Cuttings and embankments for the uses and purposes of said Road . . .

(Plaintiffs' Second Supplemental Memorandum, Dkt. #70, Ex. C). In Brookbank v. Benedum-Tress Oil Co., 131 A.2d 103, 107 (Pa. 1959), the Pennsylvania Supreme Court interpreted a similar deed containing the following language as conveying a right of way for railway purposes:

> Know All Men By These Presents, That, J.J. Ingraham and Anna Ingraham parties of the first part, for and in consideration of the sum of Three Hundred Dollars, lawful money of the United States, duly paid by the railroad company hereinafter mentioned, to us, receipt of which is hereby acknowledged, have granted, bargained, sold, released and conveyed unto the Susquehanna and Southern Railroad Company, a corporation organized under the laws of Pennsylvania, its successors and assigns, a strip of land four rods in width, and, through cuts and fills such additional width as may be needed for slopes, one-half thereof on either side of the center line as now located, of the Susquehanna and Southern Railroad, leading from Sinnemahoning, Pennsylvania, to DuBois, Sykesville, &c., through lands of the parties above mentioned, situate in Gibson Township, Cameron County, Pennsylvania.

See Brookbank, 131 A.2d at 111 (examining the "agreement in its entirety" and concluding that "[a]ll that the railroad acquired was a 'right of way' for railroad purposes"). The parties agree that the Campbell deed, like that in Brookbank, conveyed a right-of-way for railroad purposes. Here, as in Moody, no taking occurred since the conversion to interim trail use for the preservation of future rail service did not exceed the scope of the easement. See Moody, 976 A.2d at 490-92.

### 3) Category Six (Condemnation Awards) and Category Seven (Parcels With No Known Conveyance Documentation)

The parties have stipulated that those portions of the right-of-way that were acquired by the railroad pursuant to condemnation proceedings conveyed a right of way for railroad purposes to the railroad company with a possibility of reversion should it cease to be used for that purpose. (Joint Appendix, Ex. 2). The parties also have stipulated that those portions of the corridor acquired by the railroad without any known instrument of conveyance are treated under Pennsylvania law as if they

had been obtained by condemnation. Thus, Moody's holding that railbanking and interim trail use qualify as railroad purposes under Pennsylvania law controls. See Moody, 976 A.2d at 490-92.

## IV. CONCLUSION

For the reasons stated herein, Plaintiffs' motion for summary judgment is denied and Defendant's motion for summary judgment is granted. This action is hereby dismissed. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT TROHA and FREDERICK BIGNALL, on behalf of themselves and all others similarly situated,<br><br>                   Plaintiffs,<br>     v.<br><br>THE UNITED STATES OF AMERICA,<br><br>                   Defendant. | C.A. No. 05-191 Erie<br>District Judge McLaughlin |

## ORDER

AND NOW, this 25th day of February, 2010, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED. Judgment is entered in favor of Defendant and against Plaintiffs. This action is hereby DISMISSED.

                                                          /s/ Sean J. McLaughlin
                                                          United States District Judge

cm: All parties of record. ___